IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL G. MARTIN,<br>      Plaintiff,<br><br>v.<br><br>THOMAS J. FINLEY,<br>AMIL MINORA, ESQUIRE<br>MICHAEL MOORE, MD<br>GEORGE ALBANESE<br>      Defendants. | C.A. No.: 15-1620<br><br>FILED<br>SCRANTON<br><br>AUG 19 2015<br><br>PER /M/<br>DEPUTY CLERK |

### VERIFIED COMPLAINT

Plaintiff, Michael G. Martin, ("Martin"), by and through his undersigned attorneys, White and Williams LLP, by way of Complaint against Defendants Thomas J. Finley, Amil Minora, Esquire, Michael Moore, MD and George Albanese (collectively "Defendants") avers as follows:

### THE PARTIES

1. Plaintiff Michael G. Martin is a citizen of the Commonwealth of Virginia residing at 47648 Mid Surrey Square, Sterling, Virginia 20165.

2. Thomas J. Finley is a citizen of the Commonwealth of Pennsylvania residing at 1372 Birch Street, Scranton, PA 18505.

3. Amil Minora, Esquire is a citizen and licensed attorney in the Commonwealth of Pennsylvania with a principal place of business at 700 Vine Street, Scranton, PA 18510.

4. Michael Moore, MD is a citizen and licensed physician in the Commonwealth of Pennsylvania with a principal place of business at 1000 Meade Street, Dunmore, PA 18512.

5. George Albanese is a citizen of the State of New Jersey and resides at 8 Wellington Down, Suite 106, Scotch Plains, NJ 07076.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between Martin and Defendants, and the amount in controversy exceeds $75,000, exclusive of costs.

7. This Court has personal jurisdiction over Defendants as they are residents in this Commonwealth or have caused harm or tortious injury in this Commonwealth by their acts or omissions.

8. Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Martin's claims arose here.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

I. **DEFENDANTS' FALSE ALLEGATIONS AGAINST MARTIN FOR FINANCIAL IMPROPRIETIES**

9. On December 10, 2012, Martin entered into a Consulting Agreement with Med-Dev Corporation ("Med-Dev" / "Company"). A true and correct copy of the Consulting Agreement is attached at **Exhibit A**.

10. Med-Dev was initially focused on bringing a nasal clip to market that was intended to control the colonization of methicillin-resistant staphylococcus aureus (MRSA) infections.

11. Defendants Finley, Moore and Albanese are substantial shareholders in Med-Dev and members of its Board of Directors ("Board").

12. Under the Consulting Agreement, Martin was appointed Chairman of Med-Dev's Board and was tasked with using his best efforts to promote the interests and goodwill of Med-Dev.

13. Martin was to serve as Chairman from January 1, 2013 until December 31, 2015 with the opportunity to extend upon mutual agreement of the parties.

14. In exchange for his services, Martin was to receive $15,000 a month in consulting fees. *See id* at ¶ 3.

15. Under the Consulting Agreement, Martin could only be terminated for "cause." *See id* at ¶ 2.

16. Martin also personally invested in Med-Dev in exchange for 1,252,500 shares of corporate stock.

17. With Martin's assistance, Med-Dev raised $1,100,000 in investment capital and acquired two additional products by late 2013.

18. Despite this success, Defendants Finley, Moore and Albanese grew increasingly hostile towards Martin in early 2014 and sought to oust him from Med-Dev by manufacturing a controversy concerning Martin's business expenses.

19. On January 22, 2014, shortly after a contentious Board meeting, Martin received notification from Wells Fargo that Med-Dev's corporate account had been closed.

20. Martin and Defendant Finley were the only signatories on the account.

21. Martin contacted Defendant Finley regarding the account closure.

22. Defendant Finley responded that he had moved the account because he thought Martin was misappropriating corporate funds.

23. Defendant Finley had been personally monitoring Med-Dev's finances since the inception of the company in 2012 and had never voiced any concerns about Martin's expenses in over two years.

24. Defendant Finley had no discussion with Martin or Med-Dev's corporate counsel, Joseph Tomasek before closing the account.

25. Med-Dev's bylaws state that any dispute regarding allegations of misuse of corporate assets by a corporate officer or director, should be handled internally with any and all charges presented to that corporate officer and providing 30 days to either explain or rectify.

26. For months, Martin sought to address Defendant Finley's allegations at Board meetings, but Defendant Finley refused to even speak with Martin.

27. Although never formally accused of corporate misconduct, Martin nevertheless provided ample support for his expenses.

28. Even when faced with Martin's debit card transactions, Defendant Finley continued to demand physical receipts for every expense.

29. Notably, Med-Dev had no expense reporting procedure prior to Defendant Finley's accusations.

30. Martin does not deny that he identified a few mistaken payments when reviewing his expenses.

31. Martin disclosed his mistakes, noting that he was still owed approximately $25,000 in business expenses.

32. In addition, Martin stopped receiving his monthly consulting fees after Defendant Finley closed the corporate account.

33. Martin estimates the amount owed to him by Med-Dev to date is approximately $210,000.

34. To further their goals of controlling Med-Dev, Defendants needlessly attacked Martin over legitimate business expenses.

15803157v.1

35. After manufacturing the controversy regarding Martin's expenses, Defendants sought additional ways to oust Martin from the Company.

36. Defendants initially considered removing Martin in compliance with Med-Dev's bylaws.

37. On April 15, 2014, Attorney Tomasek circulated a memorandum to all of the Board members with the exception of Martin.

38. The memorandum was intended to address questions regarding the removal of Martin as Chairman.

39. In his memorandum, Attorney Tomasek stated that, absent court intervention, the removal of a director required shareholder approval.

40. Defendants knew they could not obtain shareholder approval because the majority of the shareholders strongly supported Martin due to his success in growing the Company.

## II. MARTIN'S RESIGNATION FROM MED-DEV

41. Months passed and there were no developments regarding Defendants' allegations against Martin.

42. Despite not receiving his fees under the Consulting Agreement, Martin continued to act as Chairman of Med-Dev.

43. In addition, during this time period Martin pursued additional investors and product opportunities, and also maintained communications with committed investors regarding Med-Dev's development.

44. Despite Martin's best efforts, Med-Dev began to stagnate.

45. By April 2014, Martin recognized that Defendants' false allegations were distracting the company from its mission.

46. To end the distractions and allow Med-Dev to move forward, Martin agreed to resign from the company contingent on Edward Lipes and Gregory Rainey being appointed to the Board.

47. Lipes and Rainey were more than qualified to serve as directors given their extensive experience in the medical device industry.

48. Lipes and Rainey were also substantial investors in Med-Dev, each investing $100,000 in Med-Dev.

49. Lipes and Rainey were also instrumental in attracting additional investors to the Company.

50. Given their experience and substantial investments, Martin was confident that Lipes and Rainey would refocus the company on its business objectives.

51. Defendant Finley agreed to Martin's conditions and even went so far as to say the appointment of Rainey and Lipes was a "good idea."

52. After receiving Finley's approval, Attorney Tomasek prepared a resignation letter and the "Unanimous Written Consent of Directors of Med-Dev" (the "Written Consent") reflecting that Martin's resignation was contingent on the appointment of Lipes and Rainey.

53. Martin executed his resignation on April 15, 2014.

54. Despite Martin's agreement with Defendants, Lipes and Rainey were never appointed to the Board.

55. On May 1, 2014, Martin wrote to Attorney Tomasek looking for an update on the appointment of Lipes and Rainey and received no response.

56. On May 2, 2014, Martin retracted his resignation after learning that Defendants were announcing his resignation to third-parties despite their failure to appoint Lipes and Rainey to the Board.

57. Attorney Tomasek eventually informed Martin that the Defendants had "backed out of the deal."

### III. DEFENDANTS' UNFOUNDED CRIMINAL INVESTIGATION AGAINST MARTIN

58. To prevent Martin from challenging his resignation, Defendants went to the Lackawanna County District Attorney's Office on or about May 6, 2014 and filed an unfounded criminal complaint against Martin. A true and correct copy of the Lackawanna Count incident report and supplemental narratives is attached at **Exhibit B**.

59. Sometime prior to March 5, 2014, Defendants retained Defendant Amil Minora, Esquire on behalf of Med-Dev to investigate potential criminal charges against Martin.

60. Attorney Minora's website reflects that in addition to his private practice as a plaintiff's personal injury attorney, he is also an Assistant District Attorney in Lackawanna County.

61. Defendant Finley admitted that one of the reasons he selected Attorney Minora was due to his connections in Lackawanna County.

62. Defendants, both directly and through Attorney Minora, supplied false and contrived information to the District Attorney's Office.

63. For instance, Defendants claimed that Martin improperly paid $70,000 to Scotland Yarns, LLC.

64. Scotland Yarns LLC is wholly owned by Martin.

65. Since 2012, all of Martin's monthly consulting fees from Med-Dev were paid to Scotland Yarns LLC.

66. Defendants also tried to suggest that Martin had loaned Attorney Tomasek $10,000 from Med-Dev's funds, despite the fact Attorney Tomasek had disclosed the circumstances concerning the loan to the entire Board a month earlier and demonstrated that the check Martin provided came from his Scotland Yarns account.

67. Perhaps worst of all were Defendants' efforts to convince the Lackawanna Detective to revisit Martin's 2009 arrest in Bergen County, NJ.

68. Again, prior to filing charges, Defendants received a memorandum from Attorney Tomasek fully disclosing the circumstances surrounding Martin's 2009 arrest and confirming the Bergen County charges were unfounded and ultimately dropped.

69. Despite possessing this information, Defendant Finley went so far as to reach out to his contacts in Bergen County to see if they would be willing to collaborate with the Lackawanna Detective's investigation.

70. Defendants also encouraged the Lackawanna Detective to get in touch with Bergen County.

71. The Lackawanna Detective refused because Martin's prior arrest had absolutely no bearing on her investigation.

72. The Lackawanna Detective ultimately prepared an Affidavit of Probable Cause to obtain a search warrant for Martin's bank records.

73. The Affidavit of Probable Cause was based entirely on the information and documents supplied by Defendants.

15803157v.1

74. A search warrant was ultimately issued based on the Affidavit of Probable Cause and the Lackawanna County District Attorney's Office seized Martin's bank records.

75. After the Lackawanna search warrant was issued, Martin retained counsel to defend him against Defendants' criminal claims.

76. On July 25, 2014, Attorney Minora sent Martin's counsel a "proposed" settlement agreement.

77. Attorney Minora personally prepared the settlement agreement and the other Defendants reviewed it before it was sent to Martin.

78. The settlement agreement stated "the Lackawanna County District Attorney's Office believes probable cause exists to charge Martin with criminal conduct." A true and correct copy of the proposed settlement agreement at **Exhibit C**.

79. The settlement agreement called for Martin to relinquish all interests in Med-Dev in exchange for the termination of the Lackawanna criminal investigation. *See id.* (stating "Upon Agreement of the above by Martin and in consideration for same, Med-Dev agrees to request the Lackawanna County District Attorney's Office terminate its investigation and mark the Martin investigation settled by agreement according to Pa R. Crim. Proc. 546, as described in Section 1 above").

80. Attorney Minora later sent an email to Martin's counsel threatening to pursue criminal charges in five (5) days if Martin did not agree to Med-Dev's settlement terms. A true and correct copy of Attorney Minora's threatening correspondence is attached at **Exhibit D**.

81. The Lackawanna Detective later confirmed that at no point during her investigation was there sufficient evidence to pursue criminal charges against Martin.

82. After receiving Attorney Minora's ultimatum, Martin retained new counsel to represent him in the Lackawanna investigation.

83. Martin's new counsel, Henry Hockheimer, Esquire, immediately recognized that Defendants were attempting to extort a settlement from Martin.

84. On August 28, 2014, Attorney Hockheimer sent a letter to Attorney Minora notifying him of his representation of Martin and that he believed Attorney Minora's attempt to threaten criminal action in order to gain an advantage in a civil matter could be unlawful and in violation of the Pennsylvania Rules of Professional Conduct.

85. Attorney Minora responded to Attorney Hockheimer on August 29, 2014, withdrawing Med-Dev's settlement offer.

86. On September 2, 2014, Attorney Hockheimer sent a letter to the Lackawanna Detective advising her that he was now representing Martin and expressing concern that Med-Dev might be using the assistance of law enforcement to gain an advantage over Martin in a civil dispute.

87. On September 4, 2014, Attorney Hockheimer sent the Lackawanna Detective a follow up letter concerning the theft allegations against Martin.

88. Attorney Hockheimer explained that the transfers from the Med-Dev account to Scotland Yarns, LLC represented Martin's fees pursuant to his consulting agreement with Med-Dev.

89. Attorney Hockheimer also supplied the Lackawanna Detective with a copy of the settlement agreement prepared by Defendants where criminal charges were used as leverage to threaten Martin into relinquishing all interests in Med-Dev.

90. After receiving Attorney Hockheimer's September 4, 2014 letter, the Lackawanna Detective interviewed Attorney Tomasek.

91. Attorney Tomasek discussed the personal loan he received from Martin and confirmed that funds did not come from Med-Dev and the check he received was from Scotland Yarns.

92. Attorney Tomasek also confirmed that the charges filed against Martin in Bergen County resulted from a "pissed off" investor and the charges were ultimately dismissed.

93. Finally, Attorney Tomasek told the Lackawanna Detective that he believed "there [was] something personal going on with Mr. Finley and Mr. Martin because it seems like Mr. Finley came after Mr. Martin with a vengeance demanding a criminal investigation instead of coming to [him] and asking him to look into the matter and try to work it out."

94. On September 22, 2014, the Lackawanna Detective interviewed Martin for several hours regarding his relationship with Med-Dev and the theft allegations.

95. Following this interview, the Lackawanna Detective concluded the dispute between Martin and Med-Dev was civil in nature and there was insufficient evidence to pursue criminal charges.

96. After reaching this conclusion, the Lackawanna Detective requested the District Attorney review the evidence and provide his opinion.

97. The District Attorney agreed that there was insufficient evidence to pursue criminal charges.

98. On September 30, 2014, the Lackawanna Detective advised Attorney Hockheimer that she was closing out the case.

99. After the Lackawanna Detective closed the case, Defendant Finley refused to give up and reached out to a Lackawanna Assistant District Attorney to try and convince him to pursue criminal charges against Martin.

100. The Assistant District Attorney agreed with the Detective and District Attorney's conclusion that the case should be closed.

## IV. DEFENDANTS' DEFAMATION AGAINST MARTIN

101. In addition to subjecting Martin to a criminal investigation in Lackawanna County, Defendants published false and disparaging statements about Martin.

102. On August 20, 2014, Defendants sent an email to all of Med-Dev's shareholders and investors, as well as the Company's sales and distribution partners.

103. Attached to the email was a newsletter titled "News & Views." A true and correct copy of Defendants' email correspondence and newsletter is attached at **Exhibit E**.

104. Defendants' newsletter falsely stated that Martin was "forced" to resign from Med-Dev's Board following an investigation into mishandling/misappropriation of corporate funds:

> ### Internal Happenings
>
> On April 19, 2014, after an extensive internal investigation into the alleged mishandling/misappropriation of Med-Dev corporate funds, Michael G. Martin was forced to resign as Chairman of the Board & Corporate Officer of Med-Dev. Mr. Martin is no longer associated with Med-Dev and accordingly should not be communicated with to discuss any Med-Dev Corp. business activities.
>
> Also, William P. Peters, MD, PhD resigned as an Independent Board member and as CEO. Dr. Peters continues to remain a founding member of Med-Dev.

105.  Martin was never forced to resign and only did so in hopes that by stepping down Med-Ded could focus on its business objectives with the assistance of Lipes and Rainey as board members.

106.  On January 26, 2015, Defendants sent a 100+ page manifesto to Med-Dev's investors, officers and directors again launching unfounded allegations against Martin. A true and correct copy of Defendants' manifesto without exhibits is attached at **Exhibit F**.

107.  In the manifesto, Defendants assert, among other things, that Martin violated his fiduciary duties by using corporate funds for unauthorized personal use.

108.  Notably, the majority of Defendants' allegations were disproved during their own investigation of Martin, as well as during the criminal investigation by Lackawanna County.

## COUNT I
## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS
## DEFENDANTS FINLEY, ALBANESE & MOORE

109.  Martin incorporates by reference each of the foregoing paragraphs as though fully set forth at length herein.

110.  Martin had a valid contract with Med-Dev based on his December 10, 2012 Consulting Agreement. *See* **Exhibit A**.

111.  The Consulting Agreement was formed for the benefit of Med-Dev.

112.  The purposeful actions of Defendants Finley, Albanese and Moore, including but not limited to the January 22, 2014 closure of the Wells Fargo corporate account, interfered with performance of the Consulting Agreement.

113.  Defendants Finley, Albanese and Moore were not privileged or justified in their actions nor was there cause to terminate the Consulting Agreement.

114. As a result of Defendants Finley, Albanese and Moore's interference, Martin sustained pecuniary losses in the amount of $180,000, representing his lost Consulting Fees from January 2014 to December 2014.

WHEREFORE, Plaintiff Michael Martin respectfully requests this Court award him compensatory damages in an amount in excess of $100,000, together with interest and costs of suit; punitive damages; attorneys fees; and such other and further relief as this Court deems just and proper.

## COUNT II
## UNJUST ENRICHMENT
## DEFENDANTS FINLEY, ALBANESE & MOORE

115. Martin incorporates by reference each of the foregoing paragraphs as though fully set forth at length herein.

116. From January 2014 to April 2014, Martin was not paid for services rendered to Med-Dev.

117. During this time period Martin pursued additional investors and product opportunities, and also maintained communications with committed investors regarding Med-Dev's development.

118. Defendants Finley, Albanese and Moore were aware that Martin was not donating his services to Med-Dev and expected to be compensated.

119. The benefits conferred by Martin during this time period were appreciated by Defendants Finley, Albanese and Moore as Med-Dev increased or at the very least maintained its value.

120. Defendants Finley, Albanese and Moore continue to retain such benefits and have made no attempt to adequately compensate Martin.

121. It would be inequitable for Defendants Finley, Albanese and Moore to retain such benefits without payment to Martin.

WHEREFORE, Plaintiff Michael Martin respectfully requests this Court award him compensatory damages in an amount in excess of $100,000, together with interest and costs of suit; punitive damages; attorneys fees; and such other and further relief as this Court deems just and proper.

### COUNT III
### ABUSE OF PROCESS – MALICIOUS PROSECUTION
### ALL DEFENDANTS

122. Martin incorporates by reference each of the foregoing paragraphs as though fully set forth at length herein.

123. On or about May 6, 2014, Defendants initiated a criminal complaint against Martin in Lackawanna County, Pennsylvania accusing him of corporate theft. *See* **Exhibit B.**

124. Defendants did not file their criminal complaint to seek justice, but rather out of malice and in order to hurt Martin.

125. Defendants' criminal complaint was based on false and contrived information and filed out of spite and ill-will towards Martin.

126. Defendants knew or recklessly disregarded the falsity of the information they supplied to the Lackawanna County District Attorney's Office in order to intentionally mislead the Detective.

127. The Defendants' criminal complaint constitutes a perversion of the criminal justice process.

128. The purpose of Defendants' criminal complaint was to gain collateral advantage by threatening Martin into surrendering all of his interests in Med-Dev. *See* **Exhibits C & D.**

15803157v.1

129. As a result of Defendants' criminal investigation, the Lackawanna County District Attorney's Office initiated a criminal investigation against Martin, including the issuance of a search warrant seizing Martin's bank records.

130. The Lackawanna criminal investigation was terminated in Martin's favor on or about September 30, 2014 due to lack of evidence.

131. As a result of the Lackawanna criminal investigation, Martin incurred attorney's fees in excess of $80,000.

132. The Lackawanna criminal investigation caused Martin severe mental and emotional anguish manifesting in anxiety, insomnia, intrusive thoughts, excessive weight gain and increased dosage in blood pressure medication.

WHEREFORE, Plaintiff Michael Martin respectfully requests this Court award him compensatory damages in an amount in excess of $100,000, together with interest and costs of suit; punitive damages; attorneys fees; and such other and further relief as this Court deems just and proper.

## COUNT IV
### DEFAMATION – DEFAMATION PER SE – LIBEL – FALSE LIGHT
### ALL DEFENDANTS

133. Martin incorporates by reference each of the foregoing paragraphs as though fully set forth at length herein.

134. Defendants' August 20, 2014 and January 26, 2015 publications (collectively "Publications") were circulated across the globe to all of Med-Dev's investors, officers, directors, sales partners and distributors. *See* **Exhibits E & F.**

135. Defendants' Publications included false and disparaging statements about Martin, which portray him in a false light.

136. Defendants' August 20, 2014 newsletter falsely states that Martin was "forced" to resign from Med-Dev's Board.

137. Martin was not forced to resign.

138. In addition, Defendants' Publications imputes criminal conduct to Martin, specifically the mishandling/misappropriation of corporate funds.

139. Martin did not engage in corporate misconduct.

140. Defendants knew or recklessly disregarded that the defamatory statements included in their Publications were false.

141. The intentional dissemination of Defendants' Publications was malicious, reckless, outrageous and intended to harm Martin without regard to consequences.

142. The statements included in Defendants' Publications were highly offensive as they misrepresented Martin's character.

143. Recipients of Defendants' Publications understood their defamatory meaning as they were expressly directed not to contact Martin under any circumstances.

144. Defendants' Publications harmed Martin's reputation by lowering him in the estimation of his community and business associates by raising questions as to Martin's honesty and integrity.

145. Defendants' Publications ascribe conduct to Martin that negatively reflects his fitness for position as a Board member with Med-Dev or any other company.

146. As a result of Defendants' Publications, Martin suffers from severe mental and emotional anguish manifesting in anxiety, insomnia, intrusive thoughts, excessive weight gain and increased dosage in blood pressure medication.

147. Defendants' Publications were defamatory.

148. Defendants' Publications were defamatory per se.

149. Defendants' Publications were libelous.

150. Defendants' Publications portrayed Plaintiff in a false light.

151. Defendants' Publications were not privileged, or to the extent privilege may exist, constitute abuse of such privilege.

WHEREFORE, Plaintiff Michael Martin respectfully requests this Court award him compensatory damages in an amount in excess of $100,000, together with interest and costs of suit; punitive damages; attorneys fees; and such other and further relief as this Court deems just and proper.

## COUNT V
### INTENTIONAL & NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### ALL DEFENDANTS

152. Martin incorporates by reference each of the foregoing paragraphs as though fully set forth at length herein.

153. As a direct result of Defendants' intentional, reckless, careless and/or negligent conduct, Martin suffers from severe mental and emotional anguish manifesting in anxiety, insomnia, intrusive thoughts, excessive weight gain and increased dosage in blood pressure medication.

154. Martin will require professional treatment for his physical and emotional injuries resulting from Defendants' conduct described herein.

WHEREFORE, Plaintiff respectfully request this Court award him compensatory damages in an amount in excess of $100,000, together with interest and costs of suit; punitive damages; attorneys fees; and such other and further relief as this Court deems just and proper.

                                        Respectfully submitted,

Date: August 19, 2015                WHITE AND WILLIAMS LLP

                                        By: */s/ Kevin F. Berry*
                                        Kevin F. Berry (PA# 30058)
                                        White and Williams LLP
                                        1650 Market Street
                                        One Liberty Place, Suite 1800
                                        Philadelphia, P:A 19103
                                        PH: 215.864.6290
                                        FX: 215.789.7654
                                        berryk@whiteandwilliams.com
                                        havenerk@whiteandwilliams.com

                                        *Attorneys for Plaintiff, Michael G. Martin*

15803157v.1