# Exhibit B

# Incident Report



LACKAWANNA COUNTY DISTRICT ATTORNEY'S OF
415 SPRUCE ST
SCRANTON, PA 18503

Phone: (570)963-6717 Fax: (570)963-6587

| Incident # | Reference # |
|---|---|
| 20140508M0131 | 14-9533 |

| Criminal Code | | | |
|---|---|---|---|
| | Title | : | 18 |
| | Section | : | 3921 |
| | Sub-Section | : | A |
| | Description | : | THEFT BY UNLAWFUL TAKING OR DISPOSITION |

| UCR Codes | |
|---|---|
| 0619 | THEFT-$200 AND OVER-ALL OTHER |

| | | | |
|---|---|---|---|
| Municipality | LACKAWANNA COUNTY DA (1) | | |
| Report Type | INCIDENT | | |
| Location | | | |
| Landmark | | | |
| Premise | | | |
| Point of Entry | | | |
| Meth. of Entry | | | |
| Patrol Zone | | Grid | |
| Reported | 05/06/2014 @ 14:00 (Tues) | | |
| Discovered | | | |
| Last Secure | | | |
| Received | 09:00 | Dispatched | |
| Arrived | | Cleared | |
| Status | | | |
| Disposition | | | |
| Clear Date | | | |
| Badge | 2 - DET. LISA BAUER | | |

Lisa M. Bauer 5-12-2014

| Investigating Officer Signature | Date | Approving Officer Signature | Date |
|---|---|---|---|

| 20140508M0131 | 14-9533 | 0619 - THEFT-$200 AND OVER-ALL OTHER |
|---|---|---|

## Persons Involved

**MED-DEV CORPORATION (1992)** Arrest Date : Disposition Date :

| Role | Incident Classification | How Charged | Disposition |
|---|---|---|---|
| VICTIM | 0619 THEFT-$200 AND OVER-ALL OTHER | | |

Alias
Age-DOB - / /
Race
Sex
Ethnicity
Marital Stat
Residency
SSN
Gang
Tattoo
Clothing
GBM Id
-Entered / /
-Released / /
OLN/State /
Injury

Height
Weight 0
Hair
Eyes
Build
Complex.

Home Addr 50 ALBERIGI DRIVE
SUITE 106
JESSUP, PA 18434
Home Ph #
Work Ph #
Cell Ph #
E-Mail
Employer
Occupation
Addl Addr None

No Photo

Comment Contact person - Thomas J. Finley - (570)383-6772

**MARTIN, MICHAEL** Arrest Date : Disposition Date :

| Role | Incident Classification | How Charged | Disposition |
|---|---|---|---|
| SUSPECT | 0619 THEFT-$200 AND OVER-ALL OTHER | | |

Alias
Age-DOB 63 - 07/20/1950
Race WHITE
Sex MALE
Ethnicity NON-HISPANIC
Marital Stat UNKNOWN
Residency Non-Resident
SSN 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
Gang
Tattoo
Clothing
GBM Id
-Entered / /
-Released / /
OLN/State /
Injury

Height
Weight 0
Hair BROWN
Eyes BLUE
Build LARGE
Complex. MEDIUM

Home Addr 49478 MID SURREY SQUARE
STERLING, VA 20165
Home Ph #
Work Ph #
Cell Ph #
E-Mail
Employer
Occupation
Addl Addr None

No Photo

Lisa M Bauer 5-12-2014

# Main Narrative

**DET. LISA BAUER (2)**



05/08/2014 10:45 - 2 DET. LISA BAUER

On or about May 8, 2014, this Detective telephoned Attorney Amil Minora relative to a complaint Attorney Minora made at the Lackawanna County District Attorney's Office on May 6, 2014 on behalf of Med-Dev Corporation, relative to an alleged theft. Attorney Minora stated that in May 2012, Med-Dev Corp. was formed from an idea that Dr. Michael Moore came up with for a medical device which would be placed in the nose of a physician to prevent contracting the MRSA infection. Investors from various states put money into the Company, and Corporate Counsel, Joseph Tomasek, Esquire, suggested that they needed an experienced Chief Executive Officer (CEO) to move this product further and make it public. Attorney Tomasek suggested that the Board of Directors hire one Michael Martin to act as CEO because he had dealt with him in the past. Mr. Martin was hired as CEO and was a $15,000.00 per month consulting fee, and Thomas J. (T.J.) Finley was named President of the Corporation, and both Mr. Martin and Mr. Finley were issued Corporate debit cards for the Corporate account at PNC Bank, account #53-1375-7349 to be used for Corporate matters only.

In April 2014, Mr. Finley was going over the Corporate books and found questionable transactions with the corpoate debit card issued to Mr. Martin. Mr. Finley looked into the matter further, and asked Mr. Martin about the withdrawals. Attorney Minora advise that the following actions were taken relative to the $2,500.00 payment:

On February 14, 2013, a payment in the amount of $2,500.00 was made to the Law Firm of Mauro, Savo, Camerino, Grant, & Schalk (MSCGS) using the Med-Dev debit card that was issued to Mr. Martin. Med-Dev had Attorney Tomasek as Corporate Counsel, so Mr. Finley asked Mr. Martin what that payment was for. Mr. Martin stated that the payment was a Med-Dev "start-up" legal expense, and he stated that Attorney Tomasek "farmed out" some legal work to MSCGS on behalf of Med-Dev.

On March 5, 2014, Attorney Amil Minora telephoned Charles Schalk, Esquire of (MSCGS), and requested that Attorney Schalk perform a "conflict and client search" of their Firm's records, and said search confirmed that MSCGS never performed any start-up or other legal work on behalf of Med-Dev Corp. During this telephone conversation, Attorney Schalk advised Attorney Minora that his Firm represented Mr. Martin for the start up of other companies, and Mr. Martin never paid his Firm, and that (MSCGS) filed a lawsuit against Mr. Martin on February 14, 2013 for $7,149.34. (*It is to be noted that the $2,500.00 payment was made on the same date that the lawsuit was filed against Mr. Martin).

On March 17, 2014, Attorney Minora conducted a conference call between Joseph Tomasek, Esquire and Mr. Finley, and during this telephone call, Attorney Tomasek confirmed that he personally performed ALL legal work on behalf of Med-Dev, and NEVER "subbed out" any work to any other law firm.

Attorney Minora then stated that the next questionable withdrawal was made on February 25, 2013, in the amount of $4,000.00, using the debit card issued to Mr. Martin. This withdrawal was made at a PNC Bank branch located in Sterling, Virginia, and Attorney Minora stated that the payee on the withdrawal was "Scotland Yarns, LLC", 49478 Mid Surrey Square, Sterling, Virginia 20165. Attorney Minora advised that the address is the same as Mr. Martin's home address, and that Med-Dev has no relationship with "Scotland Yards LLC".

The next questionable withdrawal was made on June 3, 2013 in the amount of $10,000.00 at the Wells Fargo branch store in Sterling, Virginia, and on June 10, 2013, Mr. Martin transferred his actual $15,000.00 consulting fee via telephone, into his PNC Bank account # ending 3947.

Attorney Minora stated that after that $10,000.00 withdrawal was made, but prior to Mr. Finley knowing about the withdrawal, Mr. Finley and Mr. Martin were driving to New Jersey on business, and Mr. Martin told Mr. Finley that he had loaned Attorney Tomasek $10,000.00, and he believed that Attorney Tomasek was trying to avoid him, and he went on sort of a rant about Attorney Tomasek not paying him back yet. Mr. Finley told Mr. Martin that it wasn't his business, and that he didn't want to discuss it with Mr. Martin.

After Mr. Finley became aware of the $10,000.00 withdrawal, he recalled Mr. Martin's conversation about loaning Attorney Tomasek the money, and he spoke with Attorney Tomasek and asked him if Mr. Martin had loaned him $10,000.00. According to Attorney Minora, Attorney Tomasek told Mr. Finley that Mr. Martin did loan him $10,000.00 around the end of May 2013, but that he paid him back the $10,000.00 around November 2013.





# Main Narrative

**DET. LISA BAUER (2)**



Attorney Minora advised that if this $10,000.00 was taken from the Corporation by Mr. Martin to loan to Attorney Tomasek, the Board never authorized that transaction, and there is no deposit of $10,000.00 back into the Med-Dev's account in November 2013.

It is to be noted that there were several other charges totaling an amount in excess of $70,000.00 on the debit card issued to Mr. Martin, that the Board feels are questionable, but upon review of that information, and upon speaking with Attorney Minora, it is believed that those issues are probably civil in nature, and do not rise to the level of criminal activity.

Upon review of all of the questionable charges, the Board confronted Mr. Martin about the unauthorized use of the Company debit card, and asked for Mr. Martin's resignation. On April 19, 2014, Mr. Martin submitted his resignation letter as Chief Executive Officer, and Chairman of the Board.

On April 29, 2014, a special emergency meeting of the Med-Dev Corp. Board of Directors was held telephonically to discuss the unauthorized use of the debit card that was assigned to Mr. Martin, to formally accept Mr. Martin's resignation, and to call for a vote to add George J. Albanese to fill the position vacated by Mr. Martin's resignation as a member of the Med-Dev Board of Directors.

Attorney Minora further advised this Detective that Mr. Finley had found that Mr. Martin was arrested for Theft By Deception in Bergen County, New Jersey on or around May 2009, and Mr. Martin had failed to disclose that information when he was hired.

On May 7, 2014, this Detective conducted a criminal history check of Mr. Martin and found that he was in fact arrested on May 7, 2009 by the Bergen County, New Jersey Prosecutor's Office. The charges filed were Theft By Deception, Document Deception, and Misconduct by a Corporate Official, and the record appears to show that all of the charges were dismissed except for the Theft By Deception charge.

Lisa M. Bauer 5-12-2014

# Supplemental Narrative



DET. LISA BAUER (2)

SUPPLEMENTAL 06/09/2014 11:07 - 2 DET. LISA BAUER

On May 13, 2014, this Detective made application for a search warrant for all bank records from June 1, 2012 to May 1, 2014 in the name of Michael Martin or Scotland Yarns from PNC Bank. On duty Magistrate Shawn McGraw approved said search warrant.

Also on May 13, 2014, this Detective made application for a search warrant for all bank records from June 1, 2012 to May 1, 2014 for Med-Dev Corp from PNC Bank. Magistrate Shawn McGraw also approved this search warrant.

Further, on May 13, 2014, this Detective served the above search warrants on Linda Nese, AVP Assistant Branch Manager of PNC Bank located at 201 Penn Avenue, Scranton, PA 18503. On or about May 19, 2014, this Detective received the requested bank records via U.S. Mail.

Upon review of the records from Med-Dev Corp. and Scotland Yarns bank accounts, this Detective found that on February 14, 2013, Mr. Martin did in fact use the Med-Dev debit card to pay attorney fees owed to Mauro, Savo, Camerino, Grant & Schalk Law Firm which was not authorized by Med-Dev.

Also, a check of Med-Dev's and Scotland Yams' bank account records confirms that on February 25, 2013 there was a withdrawal of $4,000.00 from Med-Dev Corp. which was deposited into the Scotland Yarns account on the same date. The withdrawal slip has the name of Michael Martin on it.

A further check of the Scotland Yarn's account shows that on May 13, 2013, there was a Federal Wire Transfer out of the account in the amount of $10,500.00. On May 20, 2013, there was another Federal Wire Transfer out of the Scotland Yarn's account in the amount of $10,500.00, and on November 25, 2013, there was a Federal Wire Transfer into the Scotland Yarns account in the amount of $10,000.00. One of the wire transfers out in May, and the wire transfer in, in November, fits the time frame Attorney Tomasek says he received the $10,000.00 loan from Mr. Martin, and the time frame when he says he paid Mr. Martin back the $10,000.00. This Detective told Mr. Finley that these transactions match the dates of the loan to Mr. Tomasek and the repayment of the loan to Mr. Martin, and that these funds came from Scotland Yarns account, not Med-Dev's account, and Mr. Finley stated that he was never really sure about the $10,000.00 loan, and agreed that that issue of the loan is now cleared up.

On or about May 27, 2014, this Detective received a telephone call from Attorney Frank Nocito who advised that he is representing Michael Martin. Attorney Nocito advised that he was going to call Attorney Amil Minora, and asked if this Detective would hold off on filing charges until he speaks with Attorney Minora and the victims to see if they can resolve the matter. At that time, this Detective faxed a copy of the application and affidavit for search warrant to Attorney Nocito.

Also on May 27, 2014, this Detective received a telephone call from Attorney Minora. Attorney Minora advised that he received a call from Attorney Nocito, and that Attorney Nocito scheduled a meeting for June 9, 2014 to see if they can resolve the matter prior to charges being filed.

Det. Lisa Bauer 6-9-2014

# Supplemental Narrative



**DET. LISA BAUER (2)**

SUPPLEMENTAL 09/02/2014 14:02 - 2 DET. LISA BAUER

On September 2, 2014, at approximately 9:45 AM, this Detective received a faxed letter from Attorney Henry Hockeimer, 1735 Market Street, 51st Floor, Philadelphia, PA 19103; (215) 665-8500. In said letter, Attorney Hockeimer advises that he was recently retained by Michael Martin and he is in the process of reviewing documents relative to the matter. Attorney Hockeimer further states in the letter that he is concerned that assistance from law enforcement may have been sought by the victims in this case in order to gain an advantage in a civil dispute between Mr. Martin and Med-Dev.

Also on September 2, 2014, at approximately 1:45 PM, this Detective telephoned Attorney Hockeimer and spoke with him relative to the Michael Martin investigation. This Detective asked Attorney Hockeimer's if there was a civil lawsuit filed in this matter that I was not aware of, and he stated that to his knowledge, there is not.

This Detective gave Attorney Hockeimer a synopsis of the case, and advised that back in May 2014, Attorney Amil Minora and Mr. Finley requested that an investigation be conducted into whether Mr. Martin misappropriated funds from Med-Dev. This Detective also told Attorney Hockeimer that at some point after serving the search warrant, this Detective received a call from Attorney Frank Nocito who advised that he was representing Mr. Martin, and asked if this Detective would hold off on filing any charges so that he can attempt to resolve the matter with Attorney Minora and the victims. This Detective told Attorney Hockeimer that I agreed to hold off to see if the case could be resolved, and that I have not heard anything further until receiving a phone call from Mr. Finley on Friday, August 26, 2014, wherein Mr. Finley advised that they are unable to come to a resolution, and asked that the criminal case proceed.

Attorney Hockeimer stated that he agrees with attempting to come to a resolution in cases, but he feels that the victims in this case are not just attempting to work out the amounts in question, but and are using the criminal justice system to try to get more. This Detective told Attorney Hockeimer that I am unaware of what the parties discussed to try to resolve the case, but that I did know that Attorney Nocito had been speaking with the victims.

Attorney Hockeimer advised this Detective that Mr. Martin is coming into his office to meet with him in the next few days so he can get a better understanding of the case. Attorney Hockeimer also advised that he will call this Detective after meeting with Mr. Martin, and may want to set up a date and time to bring Mr. Martin into the District Attorney's Office for an interview with this Detective.

Det. Lisa Bauer 9-2-2014

# Supplemental Narrative

DET. LISA BAUER (2)



SUPPLEMENTAL 09/04/2014 15:01 - 2 DET. LISA BAUER

On September 4, 2014, at approximately 10:00 AM, this Detective received a telephone call from Attorney Hockeimer, who left a voice message stating that he had met with Michael Martin, and that he would like to speak with this Detective regarding their meeting. At approximately 10:15 AM, this Detective returned Attorney Hockeimer's call at (215) 864-8204, and spoke with him. Attorney Hockeimer stated that upon meeting with Mr. Martin, it is his opinion that he does not believe that Mr. Martin committed any criminal acts, and advised that he was going to fax a letter to this Detective that explains why he feels that way.

Also on September 4, 2014, at approximately 11:55 AM, this Detective received the faxed letter from Attorney Hockeimer regarding Mr. Martin. Attorney Hockeimer states in his letter that in regards to the $2,500.00 payment on February 14, 2013 to the law firm of Mauro, Savo, Camerino, Grant and Schalk, using Med-Dev's debit card, "this was not an act of theft by Mr. Martin. It was simply an honest mistake." Attorney Hockeimer further stated in his letter that Mr. Martin made this mistake because he and Attorney Tomasek were involved in other businesses, and Mr. Martin promptly informed Attorney Tomasek, Med-Dev's attorney, of the mistake. Attorney Hockeimer supplied this Detective with a copy of an email from Mr. Martin to Attorney Tomasek dated March 25, 2014, wherein Mr. Martin tells Attorney Tomasek that he mistakenly thought that the $2,500.00 bill from Tomasek was for payment for work that was done for the formation of Med-Dev.

Further, Attorney Hockeimer stated that in regards to the $4,000.00 withdrawal, Scotland yarns, LLC is Mr. Martin's entity, and was not a theft. He stated that Mr. Martin and Mr. Finley both executed consulting agreements with Med-Dev in December 2012, and as delineated in their agreement, Mr. Martin was entitled to a monthly consulting fee as compensation, and this was part of his fee. He added that the same amount was deposited in January 2013 and Mr. Finley saw the bank records and never raised an issue.

Finally, Attorney Hockeimer attached a copy of the settlement agreement that Med-Dev wanted Mr. Martin to sign, and states "there is no mention in the Settlement Agreement regarding the $2,500 payment or the payments to Scotland Yarns. The focus of the Settlement Agreement is on Mr. Martin surrendering his shares of stock in Med-Dev in exchange for no criminal prosecution."

Also on September 4, 2014, at approximately 9:45 AM, this Detective telephoned Mr. Finley and asked that he have Med-Dev's corporate Attorney, Joseph Tomasek, Esquire, contact this Detective so this Detective can speak with him. Mr. Finley stated that he would have him contact me.

On September 4, 2014, at approximately 10:15 AM, this Detective received a phone call from Attorney Tomasek. This Detective asked Attorney Tomasek what his connection was with Med-Dev, and Michael Martin. Attorney Tomasek advised that he is a corporate attorney, and does corporate work for Med-Dev, and Michael Martin. He stated he has known Mr. Martin for approximately twenty-five (25) years, and he does now, and has done corporate work in the past, for various businesses owned by Mr. Martin. This Detective asked Mr. Tomasek if he was aware of an issue raised about Mr. Martin using Med-Dev funds to pay a law firm by the name of Mauro, Savo, Camerino, Grant, & Schalk, and Attorney Tomasek stated that it was brought to his attention when an Attorney Charles Schalk of Mauro, Savo called him and told him that Attorney Amil Minora had called him and asked if their firm did any start-up work for Med-Dev. Attorney Tomasek stated that Mauro Savo never did work for Med-Dev, but that Attorney Tomasek did farm out work to Mauro Savo for other businesses owned by Mr. Martin, so it was common for Attorney. Tomasek to foward invoices to Mr. Martin on behalf of Mauro Savo. Attorney Tomaske added that he shares office space with Mauro Savo. Attorney Tomasek then advised that when Mr. Martin was confronted with the $2,500.00 payment, he immediately sent an email, and made Attorney Tomasek aware that he mistakenly thought the payment was for work that Attorney Tomasek did for Med-Dev. Attorney Tomasek further stated that he does believe that it was an honest mistake by Mr. Martin, and could have been an easy mistake to make since they were dealing with various businesses.

This Detective then inquired about the $10,000.00 loan that Mr. Martin gave to Attorney Tomasek back in May 2013. Attorney Tomasek advised that he needed the money to catch up on taxes he owed, and Mr. Martin loaned him $10,500.00. He added that the check had the name Scotland Yarns on it, not Med-Dev, so he knows that the funds came out of Mr. Martin's account, not Med-Dev's. Attomey Tomasek then added that Mr. Martin owed Mauro Savo money for an outstanding bill, so when repaying the loan, he first paid the money owed to

Det Lisa Bauer 9-5-2014

## Supplemental Narrative

**DET. LISA BAUER (2)**



Mauro, Savo, and then gave Mr. Martin the remaining amount he owed him for the loan.

Attorney Tomasek added that he feels that there is something personal going on with Mr. Finley and Mr. Martin because it seems like Mr. Finley came after Mr. Martin with a vengeance demanding a criminal investigation instead of coming to Attorney Tomasek and asking him to look into the matter and try to work it out. He added that things with Mr. Martin and Mr. Finley seemed to be going great, and then Mr. Martin told Mr. Finley that Med-Dev needed someone else with experience to come in, and Attorney Tomasek feels that Mr. Finley thought that Mr. Martin was trying to get rid of him, and maybe that's why he is taking this situation to the extreme.

This Detective then asked Attorney Tomasek if he was aware of the circumstances wherein Theft charges were filed against Mr. Martin in Bergen County, New Jersey. Attorney Tomasek stated that he knows exactly what happened there. He stated that about seven (7) years ago, Mr. Martin "pissed off" an investor who put around $500,000 or $1,000,000 into one of Mr. Martin's companies. Mr. Martin secured money as a loan and said he had a certain amount of collateral which he found out he didn't actually have, and the investor knew someone in the prosecutor's office and he was arrested. Attorney Tomasek added that the charges against Mr. Martin were eventually dismissed against him.

Det. Lisa Bauer 9-5-2014

# Supplemental Narrative



DET. LISA BAUER (2)

SUPPLEMENTAL 09/24/2014 11:35 - 2 DET. LISA BAUER

On September 22, 2014, at approximately 10:30 AM, Michael Martin came into the Lackawanna County District Attorney's office to meet with this Detective. Present with Mr. Martin was his attorney, Henry Hockeimer, Esquire. At approximately 10:35 AM, this Detective read Mr. Martin his Miranda Warnings, and Mr. Martin signed a Waiver form in the presence of Attorney Hockeimer, and agreed to speak with this Detective.

Mr. Martin stated that he met T.J. Finley in Hazleton, Pennsylvania, where Mr. Finley was representing a client. Around August 2011, Mr. Martin received several telephone calls and emails from Mr. Finley asking Mr. Martin if he would meet with him about getting involved in a product invented by Dr. Michael Moore. Mr. Martin stated that Mr. Finley explained that he does not have a background in this sort of thing, and he would like Mr. Martin's help. Mr. Martin explained that he has an extensive background into silver leaching which was the process Mr. Finley told him was going to be used.

Around October 2011, Mr. Finley told Mr. Martin that Dr. Michael Moore invented a product that would eliminate nasal MRSA colonization. Mr. Finley asked Mr. Martin to come up and have dinner at with Mr. Finley and Dr. Moore. Mr. Martin stated that he did meet with them, and at that time, Dr. Moore had a crude product. Mr. Martin called a friend of his, Dr. William Peters from Ambien Island Florida, and after explaining the product, which would sit on the bridge of the nose, Dr. Peters felt that it was a good product, but that he believed that they would have a problem getting FDA approval because they were using a silver approach. Mr. Martin explained that using silver would kill the MRSA colonization by destroying the outer wall of the bacteria.

Around October 2013, Mr. Martin brought Attorney Joseph Tomasek, who he has known for approximately thirty (30) years, in to write up an exclusive licensing deal between Diamond Capital (Mr. Martin's business), and Dr. Michael Moore. Mr. Martin advised that Diamond Capital is a business in New Jersey set up by Mr. Martin and designed to work on deals like Med-Dev. Mr. Martin stated that Attorney Tomasek drew up the memorandum, and Mr. Martin gave the memorandum to Mr. Finley to forward to Dr. Moore. He added that the agreement said that Martin has the full authority to develop the product as he sees fit. Mr. Martin added that if the product was successful, Mr. Finley knew that he would be a founding partner in Med-Dev.

At the onset, Mr. Martin started doing testing on the product with Dr. Peters at Mr. Martin's expense, and Mr. Martin stated that he initially spent approximately $30,000.00 to $40,000.00 of his own money. Mr. Martin believed that it was well worth spending his own money up front to see if the product was worth forming a Company.

Mr. Martin stated that they used Clin Micro Labs out of Dunmore, PA to test the embedded silver to see if it was working. During the testing process, the product was starting to show promise, and Clin Micro Labs built a mold for them.

Around July 2012, Mr. Martin obtained the first investor for the product. The investor was Ned Lipes who was the former Chief Executive Officer of "Stryker", one of the top medical companies in the world. Mr. Martin stated that he built a relationship with Mr. Lipes, and golfed with him at the Ridgewood Country Club, and he told him about the product. When Mr. Martin told Mr. Lipes about the product, Mr. Lipes told Mr. Martin that he has been retired, and has not been investing in anything, and that this product is the first thing he is going to invest in. Mr. Lipes subsequently invested $100,000.00.

Around July or August 2012, Mr. Lipes told Mr. Martin to call Greg Rainey and tell him about the product. Mr. Martin called Mr. Rainey and told him that Mr. Lipes invested in the product, and asked Mr. Rainey to take

Det. Lisa Bauer 9-24-2014





## Supplemental Narrative

DET. LISA BAUER (2)



a look at the product and think about investing. Subsequently, Mr. Rainey invested $100,000.00 into the product.

Mr. Martin then spoke with Rick Minero and asked him to take a look at the product, and Mr. Minero and his brother ended up investing a total of $150,000.00 into the product.

Mr. Martin advised that by November 2013, a total of approximately $1.2 million came in, and all of this money was from people he brought in to invest, and money that he put in on his own.

Mr. Martin added that Mr. Finley was the President of Med-Dev, and Mr. Finley's duties were to take care of the check books, all investment money coming in, expenses, and balancing the books on a monthly basis. He added that he (Mr. Martin) was the Chairman of the Board, and his duties were to bring in investors and work on testing of the products.

Mr. Martin stated that around December 2013, Mr. Martin told Mr. Finley that Attorney Tomasek's friend was talking about possibly investing $2 million dollars in the Company, and Mr. Martin asked Mr. Finley for a balance sheet. Mr. Martin advised that Mr. Finley provided a poor balance sheet that didn't make sense, so Mr. Martin told Mr. Finley that the balance sheet didn't make sense, and had to ask for a new balance sheet.

Mr. Martin stated that the Company began launching a new hand sanitizer. Mr. Martin, Mr. Finley, Dr. Moore, Dr. Peters, and Mark Heller were mapping out their strategy, and Mr. Heller said he wanted them to move onto human testing with the product. Dr. Moore wrote up protocols, but for some reason, wouldn't distribute them to anyone but Mr. Finley. Mr. Martin began speaking with Blue Cross/Blue Shield (BC/BS) of Northeastern PA about possibly investing in the hand sanitizer, and they were deciding whether or not to invest. Shortly thereafter, the BC/BS Pittsburgh branch bought out the Northeast PA branch, and Mr. Martin started dealing with Bruce Sickel who was the Vice President of BC/BS. Mr. Sickel stated that Dr. Moore had an anti dilution clause that stated that Dr. Moore's ownership could not fall below 12%, and Mr. Sickel advised that institutions will not invest with such a clause in place. Dr. Moore and Mr. Finley then came to an agreement with BC/BS that once the Company got $2 million, there would no longer be an anti dilution clause.

Around August 2013, Mr. Finley and Dr. Moore told Mr. Martin that Dr. Moore's attorney advised him not to agree with removing the anti dilution clause. Mr. Martin told him that it was a bad idea to keep the clause because institutional investors would not get involved in the Company. Mr. Martin feels that Dr. Moore interpreted it like Mr. Martin was trying to "screw" him. Shortly thereafter, Mr. Martin called Eric Cuchesky and asked if he would be interested in being the Chief Operating Officer for the Company. Mr. Martin stated that he told Mr. Finley, and stated "Finley went crazy, and things got tense with TJ Finley".

In December 2013, Mr. Martin was ready to close a deal with a Company named Surewash for the hand sanitizer. On January 8, 2014, Mr. Finley decides that they do not want to move forward with the agreement because he felt that it was not in the best interest of Med-Dev. Mr. Finley stated it is because of Non-exclusivity, the upfront purchase of 3 new model/units all at the risk of Med-Dev, and access to their market and Distribution Channel with all of the expenses being borne by Med-Dev.

Mr. Martin then advised that he brought in a friend of his, George Albanese, who was a co founder of Med-Dev, and not a Board member. He stated that Mr. Albanese brought contacts to the area, but his wife Lois was very ill, and his main focus was his wife's health, and caring for her. At a board meeting in January 2014, Mr. Albanese was a guest, and Mr. Finley stated that he wanted to nominate Mr. Albanese to be a Board Member. Mr. Martin said they should do it right and check with Delaware Law because it wasn't on the

Det. Lisa Bauer 9-24-2014

## Supplemental Narrative



DET. LISA BAUER (2)

agenda for that meeting. Mr. Finley forced a vote anyway, and Mr. Albanese became a Board member. Mr. Martin stated that Mr. Finley told Mr. Albanese that Mr. Martin didn't want him involved in the Company anymore, which Mr. Martin stated was not true; that he just wanted to make sure they did it the right way. Mr. Martin stated that he believes that Mr. Finley said that to Mr. Albanese to turn Mr. Albanese against Mr. Martin.

The day after the meeting, Mr. Martin received an email from Wells Fargo Bank advising him that the Med-Dev checking account was closed. Mr. Martin asked who closed the account, and he was informed that Mr. Finley closed the account. Mr. Martin called Mr. Finley and asked him why he didn't tell him that he was closing the account, and Mr. Finley told Mr. Martin that he (Finley) now has control of the Board, and is running the Company. Mr. Martin asked Mr. Finley what happened to the $340,000.00 that was in the account, and Mr. Finley said, "none of your business." Mr. Martin called an attorney in Delaware and advised him of the situation, and the attorney told him that what Mr. Finley did is illegal and that charges could be filed against him. Mr. Martin stated that he told the attorney that he did not want to have charges filed against Mr. Finley.

Mr. Martin advised that Mr. Rainey then met with Mr. Finley at the request of Mr. Lipes to see what was going on with the Company. Mr. Martin stated that Mr. Finley told Mr. Rainey that he could not answer any questions on the advice of his attorney. Mr. Martin then stated that he (Martin) told Attorney Tomasek that he wanted to save the Company, and told Attorney Tomasek that he (Martin) will resign from the Board if the Company would accept Mr. Nipes and Mr. Rainey on the Board. Mr. Martin advised that he did resign from the Company, and has no ties with the Company other than his ownership of stock that Mr. Finley is trying to get from him.

This Detective asked Mr. Martin about the $2,500.00 that was paid to Mauro/Savo from the Med-Dev account. Mr. Martin stated that he had several dealings with Attorney Tomasek in various businesses, and when he received the invoice from Attorney Tomasek, he mistakenly thought the invoice was for work done for Med-Dev. He added that as soon as this mistake was brought to his attention, he went to Mauro/Savo and looked at the invoice, and then he immediately sent an email to Attorney Tomasek advising him that he made the mistake.

This Detective asked Mr. Martin about $24,689.86 that was paid to Blue Cross/Blue Shield for his insurance benefits. Mr. Martin stated that Mr. Finley was well aware that Med-Dev was paying for his benefits because he discussed it with Mr. Finley, and Mr. Finley approved it. Mr. Martin added that when he and Mr. Finley spoke about the benefits, Mr. Finley told him that he (Finley) did not need benefits because his wife is a teacher and he was on his wife's insurance. Mr. Martin advised that his insurance was paid monthly from the Med-Dev account, and Mr. Finley knew this, and reviewed the monthly statements. Mr. Martin added that druing one month, Mr. Finley even wired money into the account to cover Mr. Martin's insurance payment because there wasn't enough money in that account.

This Detective then asked Mr. Martin about the $23,266.93 of Med-Dev money that was spent at Baltusrol Country Club in New Jersey from October 1, 2012 through December 31, 2013. Mr. Martin stated that Mr. Finley and Dr. Moore were well aware that he had many sales meetings there, and that he would meet investors or potential investors there, and they would play golf at the expense of Med-Dev. Mr. Martin stated that Mr. Finley was there with him during most of these meetings and Dr. Moore and Dr. Peters were there on occasions too. Mr. Martin stated that it was entertainment expenses that Mr. Finley was well aware of.

This Detective then asked Mr. Martin about $577.80 that was spent for wine for Dr. Peters. Mr. Martin

Det. Lisa Bauer 9-24-2014

## Supplemental Narrative

**DET. LISA BAUER (2)**



stated that Dr. Peters and his wife met them in Napa, California because Dr. Peters missed out on a lot of meetings, and they were invited to Michael Chiarello's house (owner of Bottega Restaurant), and had a private wine tasting. Mr. Martin stated that he told Mr. Peters to let Med-Dev buy him a case of wine since he has been doing so much for the Company. Mr. Martin added that this was also an entertainment expense for Med-Dev business.

This Detective asked Mr. Martin about $295.47 of Med-Dev funds used to buy a Blackberry phone. Mr. Martin advised that he used his phone for Med-Dev business, and one day, his granddaughter jumped into a pool, and he jumped in to get her, and his phone was ruined. He stated that he then purchased a new phone, and that phone was used for Med-Dev business.

This Detective then asked Mr. Martin about $346.49 of Med-Dev money used to purchase a laptop. Mr. Martin advised that he used the laptop for Med Dev presentations, not for personal use. He added that he also bought an Asus tablet and an adaptor for a laptop with Med-Dev funds that he also used for Med-Dev presentations.

This Detective then discussed the $10,000.00 that was withdrawn from the Med-Dev account that Mr. Finley thought may have been a loan to Attorney Tomasek. Mr. Martin stated that he was supposed to receive $15,000.00 per month in consulting fees, a total of $180,000.00 for the year 2013, and he only received $172,000.00 total, including that $10,000.00. Mr. Martin stated that he does not understand how Mr. Finley can say that he took any money that did not belong to him when he actually received less than his agreed upon fee.

Mr. Martin ended by stating that he only used Med-Dev money to pay for Company Business, and never took any money, or used any of the Company's money to pay for anything personal. Mr. Martin added that he does fine, and makes plenty of money, and does not need to steal to survive.

At this time, this Detective asked Attorney Hockeimer if he has spoken with Attorney Amil Minora about this situation. Attorney Hockeimer stated that he sent a letter to Attorney Minora, but did not hear back from him. Attorney Hockeimer added that after reading the agreement that Attorney Minora wanted Mr. Martin to sign, he believes that Attorney Minora is attempting to use the criminal justice system to pressure Mr. Martin into turning over all of his Med-Dev stock.

Attorney Hockeimer then asked this Detective what the next step was going to be, and this Detective advised that I would type a report of my interview with Mr. Martin, and then forward the report to District Attorney Jarbola for review, and that the District Attorney will advise if he believes the case is civil or criminal in nature.

Det. Lisa Bauer 9-24-2014

# Supplemental Narrative



**DET. LISA BAUER (2)**

SUPPLEMENTAL 10/01/2014 09:28 - 2 DET. LISA BAUER

On or about September 25, 2014, District Attorney Andy Jarbola, III advised this Detective that the investigation lacks sufficient evidence to proceed with criminal charges.

On September 30, 2014, this Detective notified Henry Hockeimer, Esquire of the District Attorney's decision, and advised that this Detective will be closing out the case. Attorney Hockeimer advised that he would inform his client, Michael Martin, of the same.

For the above reason, no further reports will be forthcoming in this matter unless new and pertinent information arises.

Det. Lisa Bauer 10-1-2014