# Exhibit F



**Sent via Fedex Only**

January 26, 2015

To: Med-Dev Investors, Officer's & Directors

**Subject: Michael G. Martin Unauthorized Use of Corporate Funds and Abuse of his position as an Officer and Chairman of the Board of Directors.**

In the near future, a conference call will be scheduled to discuss the information contained in this document and answer any pertinent questions.

**The following issues are directly related to the violation of Michael G. Martins (MARTIN) fiduciary responsibility as an Officer & Chairman of the Board of Med-Dev Corp. including:**

    1.) unauthorized personal use by MARTIN of Med-Dev corporate funds and,

    2.) The abuse of his position as the former Chairman of the Board to execute NDA's, Master Service Agreements and Contracts for personal and unrelated ventures.

    3.) Reckless negotiation and attempt to commit Med-Dev to contracts beyond its ability to fulfill.

**Tab#1:**

$210,000.00: Consulting Agreement. Failure of MARTIN to disclose his indictment, arrest and arraignment for Theft by Deception in Bergen County NJ on Thursday May 7, 2009. It is understood that MARTIN fully and intentionally entered into the Consulting Agreement under false and deceptive pretenses. See <u>Section 2, "TERM."</u> This assertion is confirmed by Joseph Tomasek, Esq. former Med-Dev Corporate Counsel. It should be noted that MARTIN while receiving full-time compensation did not provide full-time services to Med-Dev as demonstrated by his other ventures including but not limited to: Wine Aerator; Epidural Needle ; NEAH Power; Alman Group.

1 | P a g e

MARTIN submitted his unconditional resignation as Chief Executive Officer and as Chairman of the Board and Director of Med-Dev Corp effective at 5:00 P.M., April 19, 2014. MARTINS' resignation was unanimously accepted by the Board of Directors on a conference call proctored by Joseph Tomasek, Esq. on April 29, 2014 at 9:00 A.M. Atty. Tomasek stated "MARTINS Consulting Agreement was null and void since it was never ratified by the Board of Directors." Prior to April 19, 2014, MARTIN stated his intention to resign in emails dated December 27 & 30, 2013.

**Tab #2:**
**$24,689.86:** From December 4, 2012 through January 8, 2014, MARTIN via Diamond Capital Advisors (His LLC) authorized Blue Cross-Blue Shield (BCBS) to extract monthly payments for his personal healthcare. MARTIN never raised this issue with the Med-Dev Board of Directors nor was it covered in his Consulting Agreement but unilaterally paid for this personal expense via EFT with Med-Dev corp. funds.

**Tab #3:**
**$23,266.93:** From October 1, 2012 through December 31, 2013, MARTIN charged the aforementioned amount to Med-Dev via a corporate debit card to satisfy charges incurred at Baltusrol Country Club in NJ. MARTIN alleges that charges related to Med-Dev activities amount to $14,483.77 although he has never submitted any justification for the alleged expenses. In a March 31, 2013 email, MARTIN acknowledges an overpayment of $8,783.16 & states *"this balance will be easily consumed by my unreimbursed travel, entertainment, etc. for the same 18 months."*

**Tab #4:**
**$2,500; 2.14.2013** - Use of Med-Dev issued debit card to Mauro, Savo, Camerino, Grant & Schalk, P.A., (MSCGS) as payment toward a personal lawsuit filed against him by (MSCGS) on **2.14.2013**. On March 5, 2013 & February 26, 2014, MARTIN stated both verbally and in writing that the charges in question related to "Med-Dev Start-up Expense. (Legal)." MARTIN further asserted that Joseph Tomasek, Esq., Med-Dev corporate counsel, had "farmed out "some legal work to MSCGS on behalf of Med-Dev. A subsequent telephone conversation between Amil M. Minora, Esq., on behalf of Med-Dev with Charles Z. Schalk, Esq. of MSCGS ensued. Atty. Minora requested Atty. Schalk to perform a "conflict and client search" of their firm's records which confirmed that MSCGS never provided any representation of, or performed any start-up or other legal work on behalf of, or for, Med-Dev Corp. During a subsequent telephone conversation on March 17, 2014 between Atty. Tomasek, Atty.

Minora and Thomas J. Finley Atty. Tomasek emphatically stated he "personally performed ALL legal work on behalf of Med-Dev and NEVER subbed out any work to any law firm." Coincidently, in an email dated April 12, 2013, Atty. Tomasek requested an additional $5,000 wire transfer to MSCGS for legal services performed which he stated was approved by MARTIN. Upon further questioning and a request for a detailed invoice, Atty. Tomasek rescinded his request as "a mistake" and subsequently resubmitted an invoice for services performed by him. Due to this and other perceived conflicts of interest between Tomasek and MARTIN, Tomasek was recently discharged as corporate counsel.

**Tab #5:**
**3.26.2013 - $1,200:** withdrawal for **"Cash for Chicago Trip."** While a legitimate trip occurred to meet with current & prospective Sales Distributors/Investors in which Mr. Finley participated, receipts for said trip were never submitted by MARTIN or any overage re-deposited to the Med-Dev account.
**4.15.2013 - $577.80: "Wine for Dr. Peters in Napa CA."** This is an unauthorized use of corporate funds.
**4.29.2013 - $295.47: "Upgrade of cell phone Blackberry Verizon."** This is a personal expense & not a Med-Dev related expense.
**5.3.2013 - $346.49; "New laptop."** This is a personal expense & not a Med-Dev related expense.
**10.4.2013 – $37.11; "Adaptor for PC Laptop to transmit video to Flat Screen TV."** This is a personal expense & not related to Med-Dev.
**12.2.2013 – $370.99: "ASUS Tablet with Keyboard for presentations and travel."** This is a personal expense & not related to Med-Dev.
** To date, MARTIN has not provided ANY documentation for any expense including but not limited to those listed above.

**Tab #6:**
**6.3.2013 - $10,000: "Consulting Agreement."** This withdrawal was made at a Wells Fargo branch store in Sterling VA. On 6.10.2013, MARTIN via telephone transferred an additional $15,000 to Scotland Yarns, LLC account ending in 3947.

**Tab #7:**

**2.25.2013 - $4,000:** withdrawal at Sterling VA branch of PNC in the name of "**Scotland Yarns.**" Verification by PNC Fraud Dept. verified PNC account ending in 3947 is "Scotland Yarns, LLC, 49478 Mid Surrey Square, VA 20165 Mr. Martin's home address. **Med-Dev HAS NO relationship with Scotland Yarns, LLC.**

**Tab #8:**

**7.1.2013 - $1,000:** "**I do not believe this is my expense.**" This withdrawal was made by MARTIN in a Wells Fargo branch store in Sterling VA.

**Tab #8:**

**7.19.2013 - "Online transfer to Med-Dev Corp. Business Checking. Transfer was made by T. J. Finley. I have never made an online transfer of money in any account, and definitely not in Med-Devs'."** Per Wells Fargo representative, on 7.18.2013, a charge of $1,646.92 by BCBS for Diamond Capital Advisors (MARTINS LLC) was initiated against the Med-Dev Savings account. Due to insufficient funds in that account (balance of $950) the charge was reversed & a NSF charge of $35 was applied to the account. On 7.19.2013, $1,000 was transferred from Med-Dev checking account to Med-Dev Savings account by MARTIN to cover MARTINS Diamond Capital Advisors BCBS charge.

**Tab #9:**

**3.25.2013; Wine Aerator –** MARTIN executed a Mutual Nondisclosure Agreement with Gilero LLC in the name of Med-Dev Corp. This agreement pertained to the development of a Wine Aerator, a personal venture of MARTIN. On May 10. 2013, a proposal for the development of the Wine Aerator was prepared by Gilero & sent to MARTIN in the name of Med-Dev. On Thursday, January 9, 2014, Mr. Tim Hopper, COO of Gilero emailed Mr. Finley with a cc: to MARTIN regarding "*the status of our payment on the <u>Wine Aerator</u> project." I would like to handle this situation amicably but without further communication I will need to take further action to ensure we are paid.*" Mr. Finley immediately called Mr. Hopper who informed Mr. Finley that payment of approximately $40-50k was owed & approaching six (6) months overdue. Mr. Finley clarified that the Wine Aerator is MARTINS personal venture & in no way related to Med-Dev. Mr. Hopper apologized & said he would follow-up with MARTIN. As of the last communication with Gilero in December 2014, the issue remained unresolved by MARTIN & Gilero intended to take whatever steps were necessary to

recover payment. MARTINS' use of Med-Dev to enlist the services of a company for a personal venture is deceptive, unethical and a breach of his fiduciary responsibilities to Med-Dev.

**Tab #10**

**3.25.2013; Epidural Needle** – MARTIN executed a Mutual Nondisclosure Agreement with Gilero LLC in the name of Med-Dev Corp. This agreement pertained to the development of an Epidural Needle developed by Dr. Thomas Senatore and his company American Surgical Device, LLC (ASD). On April 24, 2013, a proposal for the development of the Epidural Needle was prepared by Gilero & sent to MARTIN in the name of Med-Dev Corp. On or about September 4, 2013, Jeffrey Halkovich, Esq. a partner in ASD became aware of the aforementioned facts & contacted Gilero to have all future proposals prepared in the name of ASD. On March 7, 2014, ASD was contacted by Gilero who stated that due to the fact the NDA & Proposal were executed by MARTIN in the name of Med-Dev., Gilero could not release any IP including engineering drawings to ASD. Mr. Finley was subsequently contacted by Atty. Halkovich to ascertain Med-Devs' intention to lay claim to the IP, etc. Mr. Finley assured Atty. Halkovich that Med-Dev had no interest in pursuing ownership & at the request of Atty. Halkovich prepared a letter stating that position. The letter was executed by Med-Dev officers Mr. Finley & Michael F. Moore, MD & emailed to Mr. Hopper on March 21, 2014. Mr. Martin's use of Med-Dev to enlist the services of a company for a personal venture is deceptive, unethical and a breach of his fiduciary responsibilities to Med-Dev. **(Note: Messrs Senatore & Halkovich along with their partner Nabil Yazgi are all Med-Dev investors)**

**Tab #11:**

**SureWash (GLANTA LTD):** During Q 4 of 2013, MARTIN engaged GLANTA in discussions to represent their Hand Washing educational module and co-brand/market our respective products, i.e. Med-Dev Hand Sanitizer in development at that time. Discussions and emails were distributed among Med-Dev Board members regarding this opportunity. During the course of these discussions, MARTIN directed GLANTA to prepare and forward a Sales & Distribution Agreement (AGREEMENT) for review and discussion. Various iterations were exchanged with a FINAL version was forwarded by MARTIN to Mr. Finley on December 11, 2013 while MARTIN was vacationing in California. MARTIN instructed Mr. Finley to execute said AGREEMENT and return to GLANTA promptly. Upon a detailed review, it was determined by Mr. Finley that the AGREEMENT as proposed contained egregious terms that favored GLANTA including Section 3, Sales Projection/Forecast. Section 3, states, "M-D hereby <u>irrevocably</u> commits to purchasing as a

minimum the forecasted number of units from SWH in the years 2014 & 2015. (**Note: The amounts stated above, which include an additional (3) demonstration units equate to $2,684,300.00**). This considerable financial commitment was not/is not possible for Med-Dev to enter into and further discussions were terminated as evidenced by MARTINS email of January 8, 2014. Shortly thereafter, the company that Med-Dev engaged to license its Hand Sanitizer formulation, Nelcon Inc., reneged on our AGREEMENT leaving Med-Dev with no Hand Sanitizer product to market. Med-Dev has recently completed formulating a new and proprietary Instant Foaming Hand Conditioner & Sanitizer and will be sending samples within (2) weeks to our Sales/Distributors.

**Tab #12:**
**JNJ Industries:** Subsequent to the Nelcon reneging on its Hand Sanitizer License Agreement, Med-Dev management elected to pursue other avenues to secure an acceptable replacement product. In the ensuing weeks, (3) companies were identified; Safe Hands in Boca Raton FL, JNJ Inds. (Safety Smart) and Tropical Products both located near Boston MA. Telephone conversations were had with all (3) companies and samples secured from JNJ & Safe Hands. It was unilaterally determined by MARTIN that Safe Hands was unacceptable and a meeting date was established by MARTIN along with Greg Rainey to meet with JNJ at their facility in Franklin MA on Wednesday March 5, 2014. It was suggested to MARTIN to also schedule a meeting with Tropical Prods due to the proximity of one to the other which never occurred. Following the MARTIN-JNJ meeting, MARTIN generated an email on March 6, 2014 touting the ability of JNJ to provide a turnkey solution to our Hand Sanitizer needs stating, "they can manufacture, fill our bladders, install our nozzles and labeling and package/ship from one facility.........needless to say they can turnkey this whole line of products." Based on MARTINS assertions, a License Agreement was executed between JNJ & Med-Dev on April 28, 2014. However, as the relationship developed and the need to acquire specific formulation & FDA required information arose, it became readily apparent that JNJ was not the complete package that was described by MARTIN. To allay any trepidation, Mr. Finley called JNJ to arrange a visit in late May to tour their manufacturing facility only to be told by their Sales Manager Bob Enterken, that tours of the manufacturing facility WERE NOT allowed. On July 16, 2014, a conference call was conducted with JNJ to ascertain the true nature of the relationship between both parties. It was imparted to us that MARTIN and Greg Rainey were both told at the March 5 meeting that in the case of providing the Hand Sanitizer, JNJ functioned as A BROKER and NOT the manufacturer. In fact the product was manufactured for JNJ by TROPICAL PRODS. In all practicality,

there is absolutely NO reason for Med-Dev to engage the services of a BROKER to order and mark-up a product that it could and would purchase directly. We are currently attempting to determine if a side agreement exists between MARTIN and JNJ. We are pleased to inform you that the proprietary formulation described in Tab #11 is more effective than the JNJ product and is less costly allowing for very respectable sales margins for our Sales/Distributors. This is yet again, another instance of deception by MARTIN.