## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| MICHAEL G. MARTIN, | : |  |
|---|---|---|
|  | : |  |
| Plaintiff, | : |  |
|  | : | 3:15-CV-1620 |
| v. | : | (JUDGE MARIANI) |
|  | : |  |
| THOMAS J. FINLEY, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

This is an action for several causes under Pennsylvania state law arising from an

acrimonious business dispute between Plaintiff, Michael Martin ("Plaintiff" or "Martin"), and

two of his fellow business partners in a medical device company based in Scranton, Med-

Dev Corporation ("Med-Dev"), Defendants Thomas Finley ("Finley") and George Albanese

("Albanese"), and the attorney retained purportedly on behalf of Med-Dev, Defendant Amil

Minora ("Minora") (collectively, "Defendants").[1] Against Finley and Albanese, Martin alleges

tortious interference with existing contractual relations, abuse of process, defamation and

false light invasion of privacy, and intentional infliction of emotional distress ("IIED"). Martin

also alleges abuse of process and IIED against Minora. This Court has jurisdiction pursuant

to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between Martin, a Virginia

---

[1] This action is subject to an automatic bankruptcy stay under 11 U.S.C. § 362 with respect to a fourth individual, Defendant Michael Moore, M.D. ("Moore"), due to his Chapter 13 bankruptcy petition. (Docs. 78, 79, 82). Thus, Martin's case against Moore is not the subject of this Opinion and accompanying Order.

citizen, and the Defendants, who are either Pennsylvania or New Jersey citizens, and the amount in controversy is more than $75,000. (Doc. 1 ¶¶ 1-6).

Minora filed a motion to dismiss Martin's Complaint on November 2, 2015. (Doc. 22). The Court referred this motion to Magistrate Judge Carlson for issuance of a Report and Recommendation ("R&R"). After briefing from the parties, Magistrate Judge Carlson issued an R&R in which he recommended denying Minora's motion with respect to Martin's malicious prosecution, abuse of process, and IIED claims, but granting it with respect to Martin's defamation and negligent infliction of emotional distress claims. (Doc. 60). By memorandum opinion and order dated February 15, 2017, the Court adopted in part and rejected in part the Magistrate Judge's R&R, and in doing so dismissed Martin's claims against Minora for malicious prosecution, defamation and false light, and negligent infliction of emotional distress, leaving claims for abuse of process and IIED.[2] (Docs. 64, 65).

Finley, Albanese, and Moore filed a motion for judgment on the pleadings on March 9, 2016. (Doc. 37). This motion was likewise referred to Magistrate Judge Carlson for issuance of an R&R. Magistrate Judge Carlson issued an R&R in which he recommended denying the motion with respect to Martin's tortious interference, unjust enrichment, malicious prosecution, abuse of process, defamation, and IIED claims, but granting it with respect to his negligent infliction of emotional distress claim. (Doc. 63). The Court adopted in part and rejected in part the Magistrate Judge's R&R, dismissing the malicious

---

[2] In his response to Defendant Minora's motion to dismiss, Plaintiff voluntarily dismissed the defamation/false light claim against Defendant Minora. (Docs. 57 at 1, 60 at 12).

2

prosecution and negligent infliction of emotional distress claims, but retaining the remaining claims as to those Defendants (tortious interference, abuse of process, defamation/false light, and IIED).[3] (Doc. 66).

Defendants have filed separate motions for summary judgment with accompanying briefs in support ("Motion(s)"). (Docs. 108, 122 (Albanese), 111, 125 (Finley), 116, 123 (Minora)). Martin has opposed these motions ("Opposition(s)"). (Docs. 129 (Opposition to Albanese), 143 (Opposition to Minora), 145 (Opposition to Finley)). Only Albanese submitted a reply to Martin's Opposition ("Reply"). (Doc. 137). Martin did not file a cross-motion for summary judgment against any Defendant. Accordingly, the Motions are ripe for review. Because Defendants have submitted similar or nearly identical statements of purportedly undisputed fact and raise the same arguments in their Motions, and Martin's Opposition to each Motion is likewise mirrored, the Court will consolidate its analysis of the Motions in this Opinion. For the reasons that follow, Defendants' Motions will be granted in part and denied in part.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are undisputed except where specifically noted as disputed.

In June 2012, Plaintiff was the sole incorporator of Med-Dev, a Delaware corporation. (Docs. 108 ¶ 1, 112 ¶ 1, 117 ¶ 1). At least part of the reason for the formation of Med-Dev was to distribute "a novel intra-nasal clip that was intended to serve as a non-

---

[3] Plaintiff later stipulated to dismiss his unjust enrichment claim against Defendants Finley, Albanese, and Moore on December 1, 2017. (Docs. 99, 100).

3

antibiotic treatment for nasal methicillin-resistant infections." (Doc. 117 ¶ 2). The initial shareholders of Med-Dev included Plaintiff, Defendant Finley, Defendant Albanese, and several others. (Docs. 109 ¶ 2, 112 ¶ 2). Neither Plaintiff nor any of the Defendants invested any money into Med-Dev, as separate investors provided the financial capital. (Docs. 109 ¶¶ 3-5, 112 ¶¶ 3-5).

Plaintiff served as the initial Chairman of the Board of Directors of Med-Dev ("Board"), (Docs. 109 ¶ 9, 112 ¶ 9, 117 ¶ 3), and was "a Director and Officer of Med-Dev," (Docs. 109 ¶ 17, 112 ¶ 17). His duties "included attracting investors, distribution of products, sales, testing of the products, and overall direction of the Company." (Docs. 109 ¶ 10, 112 ¶ 10, 117 ¶ 4). Plaintiff never had any other official title at Med-Dev, (Docs. 109 ¶ 11, 112 ¶ 11), but he asserts he functionally served as the CEO of Med-Dev at times, "rais[ing] money and organiz[ing] individuals to do what they needed to do to get things done," (Docs. 128 ¶ 12, 144 ¶ 12). Finley served as the President of Med-Dev, and "his duties included taking care of the check books, paying the expenses, balancing the books on a monthly basis, and the operations of the company." (Docs. 109 ¶ 13, 112 ¶ 13, 117 ¶ 5). The members of the Board in 2013 were Plaintiff, Finley, Moore, and William Peters, M.D. (Docs. 109 ¶ 14, 112 ¶ 14). Albanese was appointed to the Board on January 16, 2014, (Docs. 109 ¶¶ 15-16, 112 ¶¶ 15-16), although Plaintiff contends that Albanese resigned from the Board shortly afterwards, (Docs. 128 ¶¶ 15-16, 144 ¶¶ 15-16). Albanese

4

was later appointed Chairman of the Board on April 29, 2014—an appointment later invalidated by the Delaware Chancery Court. (*Id.*)

Upon forming Med-Dev, Plaintiff adopted a set of bylaws for the company ("Bylaws"), (Docs. 109 ¶ 36, 112 ¶ 32), although he asserts that they were never formally adopted by the Board, (Docs. 128 ¶ 36, 144 ¶ 32). The Bylaws outline the rules governing the conduct of the internal affairs of Med-Dev, although Plaintiff contends that Med-Dev rarely, if ever, followed the Bylaws, stating that "Med-Dev operated informally and there were no Board Resolutions for any of the actions taken by the Board." (Docs. 128 ¶¶ 39-42, 144 ¶¶ 35-37). The Bylaws state: "The business and affairs of the Corporation will be managed by or under the direction of its Board who may exercise all such powers of the Corporation." (Docs. 109 ¶ 37, 112 ¶ 33). Authorized committees with designated power and authority can be designated by the Board, upon Board resolution. (Docs. 109 ¶ 39, 112 ¶ 35). The Bylaws further state that contracts or transactions between Med-Dev and its Directors or officers "will not be void or voidable . . . solely because the Director or Officer is present at or participates in the meeting of the Board or committee thereof that authorizes the contract or transaction . . . , if" material facts regarding the Director or Officer's interest are known or disclosed to the Board or authorized committee or shareholders and the contract or transaction is approved by vote of the Board or shareholders, or the contract or transaction is "fair" and is otherwise approved by the Board, authorized committee, or shareholders. (Docs. 109 ¶ 38, 112 ¶ 34). The Bylaws also state that Board Directors can receive

5

compensation "for their services and reimbursement for their expenses" by Board resolution, although a resolution is not needed for compensation paid to Directors "serving the Corporation in any other capacity." (Docs. 109 ¶ 41, 112 ¶ 36).

"On December 10, 2012, [Plaintiff] executed a Consulting Agreement 'to render services as Chairman of the Board of Directors' of Med-Dev in return for compensation of $15,000 per month for a three year term commencing January 1, 2013." (Docs. 109 ¶ 46, 112 ¶ 41). Finley signed the Consulting Agreement as President of Med-Dev, and Plaintiff signed it as Consultant. (Docs. 109 ¶ 47, 112 ¶ 42). Plaintiff's Consulting Agreement prohibited the assignment of the Consultant's rights, duties, or obligations under the Consulting Agreement "without the prior written consent of [Med-Dev]," and did not "provide for any other payments or benefits such as health insurance to be paid to [Plaintiff]." (Docs. 109 ¶¶ 55, 58, 112 ¶¶ 49, 52). The Board never formally voted to approve Plaintiff's Consulting Agreement or the payment of health benefits to Plaintiff. (Docs. 109 ¶¶ 48, 52, 59, 62, 112 ¶¶ 43, 53, 56). However, Plaintiff asserts that the Consulting Agreement was valid because Finley, as Med-Dev's President, signed it, and it was further "ratified and consented to by Med-Dev through the continued payments of compensation to [Plaintiff] in accordance with the terms of the Agreement." (Docs. 128 ¶ 48, 144 ¶ 43). Finley and Board Director Peters also were paid monthly compensation by Med-Dev under similar agreements, and these also were not formally approved by the Board. (Docs. 109 ¶ 64, 122 at 36, 125 at 4, 36, 128 ¶¶ 38, 43, 144 ¶¶ 34, 38). The parties dispute whether Plaintiff was

6

paid under the Consulting Agreement solely as Chairman of Med-Dev, or in another role, (Docs. 109 ¶ 54, 112 ¶ 48, 128 ¶ 54 (Plaintiff asserting that compensation "was for the services he provided for the operation of Med-Dev"), 144 ¶ 48 (same)), but do not dispute that "[t]he Consulting Agreement specifically states that [Plaintiff] is 'an independent contractor and not an employee of the Company,'" (Docs. 109 ¶ 60, 112 ¶ 54).

Arguments about Plaintiff's use of Med-Dev funds began in earnest in late 2013 and into early 2014. (Docs. 109 ¶¶ 85, 92, 112 ¶¶ 77, 84, 117 ¶¶ 6, 12). The parties do not dispute that Plaintiff improperly used $2,500 of Med-Dev funds in 2013 to pay a legal bill to the Mauro Savo law firm that was unrelated to Med-Dev. (Docs. 109 ¶¶ 70-74, 112 ¶¶ 62-66, 117 ¶¶ 7-11, 128 ¶¶ 70-74, 142 ¶¶ 7-11, 144 ¶¶ 62-66). However, Plaintiff contends that this payment was an honest mistake arising out of confusion regarding the name of what he mistakenly thought was a predecessor LLC to Med-Dev, and that he informed Med-Dev's corporate counsel, Attorney Joseph Tomasek, as soon as he learned of the purported mistake. (Docs. 128 ¶ 70, 142 ¶ 7, 144 ¶ 62). The parties also do not dispute that Plaintiff used Med-Dev funds to pay $8,517 in expenses at a country club that were unrelated to Med-Dev business. (Docs. 109 ¶¶ 75-76, 112 ¶¶ 67-68, 117 ¶¶ 14-15, 128 ¶¶ 75-76, 142 ¶¶ 14-15, 144 ¶¶ 67-68). However, the parties dispute the propriety of Plaintiff charging his health insurance premiums to his Med-Dev debit card. (Docs. 109 ¶¶ 78-79, 112 ¶¶ 70-71, 117 ¶¶ 18-19, 128 ¶¶ 78-79, 142 ¶¶ 18-19, 144 ¶¶ 70-71). Finley and Albanese and Plaintiff also disagree on the propriety of Plaintiff's directing his fees paid under his

7

Consulting Agreement to an LLC owned by Plaintiff, Scotland Yarns, LLC. (Docs. 109 ¶¶ 56-57, 112 ¶¶ 50-51, 128 ¶¶ 56-57, 144 ¶¶ 50-51).[4] The parties agree that Plaintiff did not separately reimburse Med-Dev for the Mauro Savo legal fees or country club expenses, and that Plaintiff offered to offset the $2,500 in legal fees paid to Mauro Savo against expenses he had not yet turned in to Med-Dev. (Docs. 109 ¶ 86-87, 112 ¶ 78-79, 117 ¶ 13, 17). Plaintiff also claims he offset the $8,517 in country club expenses, and that Med-Dev owed him $52,000 in unpaid consulting fees and unreimbursed expenses by early 2014. (Docs. 128 ¶ 87, 142 ¶ 17, 144 ¶ 79). In his portion of the record, Plaintiff includes a sworn statement from Attorney Tomasek that states that Finley and Albanese did not communicate with Martin about the alleged expenditure issues or discuss the issues at Board meetings that the attended, and that he counseled them to speak with Martin "so he would have the opportunity to rebut or explain the charges and ultimately resolve the issues." (Doc. 144-16 ¶¶ 14-15).

Finley closed Med-Dev's Wells Fargo bank account in January 2014 to prevent Plaintiff from accessing Med-Dev funds, and told him he was closing the account "because [Plaintiff] was taking consulting fees from it" and "because [Finley] thought [Plaintiff] was misappropriating corporate funds." (Docs. 109 ¶¶ 91-93, 112 ¶¶ 83-85). Plaintiff asserts that Albanese was involved in this decision as well. (Doc. 128 ¶ 91). January 2014 was

---

[4] Although not stated in their Statements of Fact, the record shows that Defendants appear to challenge Plaintiff's issuance of a $10,000 loan from Med-Dev's funds to Attorney Tomasek for matters unrelated to Med-Dev. (Doc. 109-2 at 35).

also the last month that Plaintiff received his monthly consulting fee from Med-Dev. (Docs. 109 ¶ 66, 112 ¶ 58). In addition to Finley's actions, Minora was also hired in March 2014 to investigate Plaintiff's use of corporate funds. (Docs. 109 ¶ 82, 112 ¶ 74, 117 ¶¶ 21-22). At the time of his hiring, Minora was a Scranton attorney in private practice, but the parties dispute whether he was a former or current prosecutor for the Lackawanna County District Attorney's Office ("LCDA"). (Docs. 117 ¶ 23, 128 ¶ 110, 142 ¶ 23, 144 ¶ 116). Plaintiff asserts that Minora's hiring was not on behalf of Med-Dev, but was rather orchestrated by Defendants Finley, Albanese, and Moore, as Board Director Peters was not aware of Minora's hiring; Plaintiff further asserts that there was no written engagement letter between Med-Dev and Defendant Minora. (Docs. 128 ¶ 96, 142 ¶ 21, 144 ¶ 88).

Around this time, Plaintiff "offered to resign as Director and Chairman of the Board of Med-Dev effective April 19, 2014 contingent on Edward Lipes ('Lipes') and Gregory Rainey ('Rainey') being appointed to the Board." (Docs. 109 ¶ 21, 112 ¶ 19). "At the time of his resignation from Med-Dev on April 19, 2014, [Plaintiff] believed the company had 'gotten dysfunctional,' it was 'heading off a cliff,' and Dr. Moore and Finley had 'gone rogue.'" (Docs. 109 ¶ 26, 112 ¶ 24). Defendants Finley and Albanese and Plaintiff dispute whether the allegations surrounding Plaintiff's unauthorized expenditures were the driving force behind Plaintiff's offer to resign, (Docs. 109 ¶¶ 21, 28, 112 ¶¶ 19, 26), although Plaintiff acknowledges that the allegations were "distracting Med-Dev from its mission" and he wanted "to end the distractions and allow Med-Dev to move forward," (Docs. 128 ¶¶ 21, 28,

9

144 ¶¶ 19, 26). "[Plaintiff] signed a written resignation letter April 19, 2014 prepared by Attorney Tomasek that was unconditional." (Docs. 109 ¶ 22, 112 ¶ 20). Plaintiff later informed Med-Dev he was retracting his resignation offer because Lipes and Rainey were not appointed to the Board, and the Delaware Chancery Court officially reinstated Plaintiff as a Director on the Med-Dev Board on October 27, 2015, ruling that Attorney Tomasek should have disclosed to Plaintiff that Med-Dev viewed the resignation as unconditional and that Med-Dev did not satisfy the terms of the resignation offer originally presented to Plaintiff. (Docs. 109 ¶¶ 23, 25, 112 ¶¶ 21, 23). Plaintiff is emphatic that he was not "forced to resign" from the Med-Dev Board, (Doc. 128 ¶ 119), and also notes that he told Finley and Albanese in December 2013, prior to the unauthorized expense issues being raised by Finley, that he was planning to resign in the first half of 2014, (Docs. 128 ¶ 33, 144 ¶ 26).

Also around the time of Plaintiff's resignation from the Board and his subsequent retraction of the resignation, Defendant Minora's "investigation" into Plaintiff's use of corporate funds led to the initiation of a criminal complaint with the LCDA. (Docs. 109 ¶ 99, 112 ¶ 91, 117 ¶ 30). Plaintiff contends that Defendant Minora filed the criminal incident report with the LCDA on behalf of Defendants Finley, Albanese, and Moore, not on behalf of Med-Dev, and that Defendant Minora "did not conduct any individual factual investigation into [Plaintiff's] use of Med-Dev corporate funds." (Docs. 128 ¶¶ 97, 99, 142 ¶¶ 28, 30, 144 ¶¶ 89, 91). However, the parties agree that "[Defendant] Minora reviewed internal Med-Dev documents, he spoke to an attorney at Mauro Savo, he spoke to Attorney Tomasek, and he

10

sent correspondence to the Mauro Savo firm." (Docs. 109 ¶ 83, 112 ¶ 75, 117 ¶ 24). After this review, Defendant Minora spoke with LCDA detectives. (Docs. 109 ¶¶ 97-98, 112 ¶¶ 89-90, 117 ¶¶ 28-29). "'Based upon information [Defendant] Finley provided, [LCDA Detective] Bauer obtained two search warrants. The first was to obtain [Plaintiff's] bank records; the second sought Med-Dev's bank records in order to verify what [Defendant] Finley and [Defendant] Minora had reported." (Doc. 117 ¶ 31). LCDA Detective Bauer found, from review of bank records, that Plaintiff had made the improper $2,500 payment to the Mauro Savo law firm. (Doc. 117 ¶ 32).

The parties vigorously dispute exactly what happened next. All agree that Plaintiff's attorneys at the time contacted the LCDA and Defendant Minora on or about May 27, 2014 to suggest that the criminal investigation be halted to discuss a possible civil settlement between Plaintiff and Med-Dev, and that "[Plaintiff] authorized his attorneys to try and settle with Med-Dev to avoid possible criminal charges against him." (Docs. 109 ¶¶ 100-101, 112 ¶¶ 92-93, 117 ¶¶ 33, 35). However, the parties disagree on how settlement negotiations proceeded. Defendants state that [Plaintiff's] attorneys were the ones that proposed that Plaintiff would agree to give up his Med-Dev stock and resign from Med-Dev. (Docs. 109 ¶ 102, 112 ¶¶ 94, 106-07, 117 ¶¶ 36-37, 41). Plaintiff contends that it was Defendants who pursued this course:

> To the contrary, it was [Defendant] Attorney Minora who indicated to Martin's attorneys that his clients wanted [Plaintiff] out of the Company and if they could achieve this by settlement, his clients would not continue to advocate for [Plaintiff's] criminal prosecution . . . [Defendant] Attorney Minora raised the

11

idea of a settlement agreement and volunteered to draft the settlement agreement.

(Docs. 142 ¶¶ 36-37, 144 ¶¶ 106-07). The parties also dispute whether [Defendant] Minora's August 2014 communication with [Plaintiff's] lawyers constituted a threat that if Plaintiff did not sign the settlement agreement, Defendants would seek criminal charges against Plaintiff, and that Defendants had a corrupt purpose in filing the initial criminal complaint with the LCDA. (Docs. 109 ¶¶ 104, 110, 128 ¶¶ 104, 110, 112 ¶¶ 96, 116, 117 ¶¶ 42-44, 142 ¶¶ 42-44, 144 ¶¶ 96, 116). The LCDA terminated its criminal investigation in September 2014, and Plaintiff asserts that Defendants tried to get the LCDA to reopen the investigation by going to another assistant district attorney, but were unsuccessful. (Docs. 128 ¶ 110, 142 ¶ 43).

The relationship between the parties continued to deteriorate. On August 20, 2014, a newsletter (the "Newsletter") was sent to at least some of Med-Dev's shareholders, investors, and partners, a portion of which included the following text:

*Internal Happenings*

On April 19, 2014, after an extensive internal Investigation into the alleged mishandling/misappropriation of Med-Dev corporate funds, Michael G. Martin was forced to resign as Chairman of the Board & Corporate Officer of Med-Dev. Mr. Martin is no longer associated with Med-Dev and accordingly should not be communicated with to discuss any Med-Dev Corp. business activities.

Also, William P. Peters, MD, PhD resigned as an Independent Board member and as CEO. Dr. Peters continues to remain a founding member of Med-Dev.

12

(Doc. 112-4 at 61). Additionally, a lengthy document (the "Manifesto") was sent to Med-

Dev's shareholders, investors, and partners in January 2015 that included the following text:

**Subject: Michael G. Martin Unauthorized Use of Corporate Funds and Abuse of his position as an Officer and Chairman of the Board of Directors.**
In the near future, a conference call will be scheduled to discuss the information contained in this document and answer any pertinent questions.

**The following issues are directly related to the violation of Michael G. Martins [sic] (MARTIN) fiduciary responsibility as an Officer & Chairman of the Board of Med-Dev Corp., including:**
**1.) Unauthorized personal use by MARTIN of Med-Dev corporate funds and,**
**2.) The abuse of his position as the former Chairman of the Board to execute NDA's, Master Service Agreements and Contracts for personal and unrelated ventures.**
**3.) Reckless negotiation and attempt to commit Med-Dev to contracts beyond its ability to fulfill.**

(Doc. 109-2 at 129) (bold print in original). The Manifesto also contained reference to the

purported failure of Plaintiff "to disclose his indictment, arrest and arraignment for Theft by

Deception in Bergen County, NJ on Thursday May 7, 2009." (*Id.*) It also stated that "'[i]t is

understood that [Plaintiff] fully and intentionally entered into the Consulting Agreement

under false and deceptive pretenses . . . [and that] [t]his assertion is confirmed by Joseph

Tomasek, Esq., former Med-Dev Corporate Counsel." (*Id.*) Plaintiff argues that Defendants

should have known he never pled guilty to the Bergen County charges, and attaches an

affidavit from Tomasek stating that: "At no time did I ever advise Mr. Finley, Mr. Albanese,

Dr. Moore, or Attorney Minora that when speaking to any investors about their investment in

13

Med-Dev they must advise the investors that [Plaintiff] committed a felony in New Jersey."
(Doc.144 ¶ 82, 144-16 ¶ 9).

Defendants Finley and Albanese also contend that Tomasek "directed Med-Dev to
notify the Med-Dev investors about [Plaintiff's] unauthorized expenditures," (Docs. 109 ¶ 88,
120, 112 ¶ 80, 98), but Plaintiff responds that Tomasek did not direct Med-Dev to send out
the Manifesto, because he had left the company in December 2014, and that Tomasek's
previous instruction to Med-Dev in April 2014 to update the shareholders and investors on
the expense issue did not entitle Defendants to disseminate false information, (Docs. 128
¶¶ 88, 120, 144 ¶¶ 80, 98). The parties further dispute whether Defendant Finley acted
alone in preparing and sending the Newsletter and Manifesto. (Docs. 109 ¶¶ 111-21, 128
¶¶ 111-21).

With respect to Plaintiff's alleged emotional distress he suffered at the hands of
Defendants, the parties agree that Plaintiff "has not produced a medical expert report to
prove his emotional distress claim at trial," and that, at the least, he has not had specific
treatment solely for anxiety or counseling since January 1, 2013. (Docs. 109 ¶¶ 122-23,
112 ¶¶ 99-100, 117 ¶¶ 48-49, 128 ¶¶ 122-23, 142 ¶¶ 48-49, 144 ¶¶ 99-100).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not
present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,
. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

14

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

15

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Defendants seek summary judgment on all of Plaintiff's remaining claims against

them. As previously discussed, although they submitted separate Motions, their arguments

and characterization of the facts are mostly the same. The Court will address each of

Plaintiff's remaining claims in turn and will note the few instances where there are

distinctions between Defendants' relative positions.

### A. TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS (COUNT I – DEFENDANTS FINLEY AND ALBANESE)

In their Motions, Defendants Finley and Albanese first maintain that they are entitled

to summary judgment on Plaintiff's first claim, tortious interference with existing contractual

relations. Pennsylvania has adopted the Restatement (Second) of Torts standard for this tort. *Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1181-84 (Pa. 1979); Restatement (Second) of Torts § 766.[5] To succeed on a claim for tortious interference, Plaintiff must prove (1) the existence of a contractual relationship between Plaintiff and a third party; (2) purposeful action on the part of Defendants, specifically intended to harm the existing relationship; (3) the absence of privilege or justification on the part of Defendants; and (4) actual legal damages resulting from Defendants' conduct. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004). In his Complaint, Plaintiff pleads that Defendants Finley and Albanese, without justification or privilege, interfered with his Consulting Agreement with Med-Dev by closing the Med-Dev Wells Fargo bank account and engaging in other conduct, which led to the loss of $180,000 in consulting fees to which he claims he was entitled. (Doc. 1 ¶¶ 109-114).

Defendants Finley and Albanese take a sweepingly broad approach in raising five arguments in their Motions against this claim: (1) the Consulting Agreement between Finley and Med-Dev was void from the start because it was never formally approved by Med-Dev's Board; (2) there was no culpable conduct on the part of either Defendant Finley or

---

[5] Section 766 explains the tort as:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

Albanese, either because they were not involved in the decision to discipline Plaintiff or because Plaintiff made the decision to resign from Med-Dev on his own; (3) there is no third-party in Plaintiff's posited scenario, because Med-Dev and Defendants Finley and Albanese, as Directors of Med-Dev, should be treated as the same party; (4) Plaintiff's claim should be treated as arising from a claim for defamation, which has a one year statute of limitations, and should be time-barred as such; and (5) Plaintiff's claim should be barred by the Gist of the Action doctrine because Plaintiff's cause of action is essentially for breach of the Consulting Agreement, and is not a tort. Each argument fails to convince the Court that summary judgment should be granted.

### 1. VALIDITY OF THE CONSULTING AGREEMENT

Defendants Finley and Albanese challenge the first element of the tort, the existence of a contract, by attacking the validity of the Consulting Agreement. They argue that the undisputed facts establish that the Consulting Agreement is void as an unauthorized "backroom reciprocity deal" between Defendant Finley and Plaintiff, never approved by the Med-Dev Board in violation of the Med-Dev Bylaws. (Docs. 122 at 15-16, 125 at 15-16). Plaintiff responds that the Consulting Agreement was signed by Defendant Finley, the President of Med-Dev, on behalf of Med-Dev, and that under relevant Delaware corporate law, Defendant Finley had the authority to enter Med-Dev into the contract with Plaintiff. (Docs. 129 at 4, 145 at 4). Plaintiff also contends that the Consulting Agreement was ratified through conduct because Med-Dev paid Plaintiff for a year, and both parties were

18

performing their obligations under the Consulting Agreement until Defendant Finley and Albanese's wrongful interference. (Docs. 129 at 4, 145 at 4-5). Plaintiff finally notes that Defendant Finley's position is "completely disingenuous," because he was getting paid under a nearly identical contract from Med-Dev. (Doc. 145 at 4-5).

Relying on the Bylaws, Defendant Finley and Albanese's position is essentially that there was no proper offer and acceptance between Med-Dev and Martin with respect to the Consulting Agreement. However, as Plaintiff points out, they cite to no legal authority in support of their position that the apparent failure of the Med-Dev Board to formally approve the Consulting Agreement, pursuant to the Bylaws, renders it void. Instead, the factual record is replete with material disputes that make it impossible for the Court to conclude, as a matter of law, that the Consulting Agreement was not properly offered or accepted by either Med-Dev or Plaintiff.

For example, Plaintiff contends that "Med-Dev operated informally and there were no Board Resolutions for any of the actions taken by the Board" such as setting up committees, leasing office space, expenditures, and contracts. (Docs. 128 ¶¶ 39-42, 144 ¶¶ 35-37). Indeed, Plaintiff, citing an email from Defendant Albanese, states that the Bylaws themselves were never formally adopted by the Board.[6] (Docs. 128 ¶ 36, 144 ¶ 32).

---

[6] The email ascribed to Defendant Albanese also states that the "Bylaws [Plaintiff] references were taken off the shelf and were for a public company." (Doc. 144-10 at 1). While the use of boilerplate corporate bylaws does not necessarily negate their force, it suggests, when combined with the other parts of the factual record, that Med-Dev operated rather informally.

19

Thus, whether adherence by the parties and Med-Dev itself to the Bylaws was required is in dispute.

Additionally, the factual record is murky with respect to the exact nature of Plaintiff's employment with Med-Dev. The Consulting Agreement itself is contradictory, stating that Plaintiff, as "Consultant," is "an independent contractor and not an employee of [Med-Dev]," (Docs. 109 ¶ 60, 112 ¶ 54), but also that Plaintiff is being retained to act as Chairman of Med-Dev's Board, (Docs. 109 ¶ 46, 112 ¶ 41). The parties also dispute whether Plaintiff was paid under the Consulting Agreement solely as Chairman of Med-Dev, or in another role. (Docs. 109 ¶ 54, 112 ¶ 48, 128 ¶ 54 (Plaintiff asserting that compensation "was for the services he provided for the operation of Med-Dev"), 144 ¶ 48 (same)). As the Bylaws only require formal authorization for the approval of compensation agreements with corporate directors being compensated in their role as directors, (Docs. 109 ¶ 41, 112 ¶ 36), it is uncertain that the Bylaws, even if adopted and observed, would apply to Plaintiff and the Consulting Agreement.

Finally, although tortious interference with contract requires a "contract," it is not "necessary that the contract be legally enforceable against the third person . . . [because] [a] promise may be a valid and subsisting contract even though it is voidable." Restatement (Second) of Torts § 766 cmt. f. Thus, even if there are defenses that the third-party (in this case, Med-Dev) could raise to enforcement of the Consulting Agreement, such as a lack of mutuality in entering the contract, "until [the third party] does, the contract is a valid and

20

subsisting relation, with which the actor is not permitted to interfere improperly." *See id.*
The parties agree that Plaintiff was paid for months in exchange for his work under the
Consulting Agreement and then was not paid starting in January 2014. However, no party
asserts that the failure of Med-Dev to pay Plaintiff starting in January 2014 was due to Med-
Dev contemporaneously declaring the Consulting Agreement to be void due to fatal errors in
its formation. Instead, the factual record contains references to a late April 2014 Special
Board meeting that may have included discussion of a retroactive termination of the
Consulting Agreement, but the basis for a possible retroactive termination is unclear.
(Docs. 109 ¶ 35, 112 ¶ 31, 112-4 at 14 ¶ 70). Nor does Med-Dev itself advance the
argument now that the Consulting Agreement is void, because Med-Dev is not a party to
this case.

In sum, given the tangled web of factual disputes here, Defendant Finley and
Albanese have not established, as a matter of law, that the Consulting Agreement was void.
Hence, they are not entitled to summary judgment on this ground.[7]

## 2.    "CULPABLE CONDUCT"

Defendants Finley and Albanese also argue that they did not engage in any
"culpable conduct" to interfere with Martin's Consulting Agreement with Med-Dev. (Docs.
122 at 16-17, 125 at 17-18). Defendant Finley argues that "[t]here is no authority to support

---

[7] The Court notes the irony in Defendant Finley challenging the validity of the Consulting Agreement when
Defendant Finley himself had a nearly identical contract with Med-Dev that was never formally approved by
the Board. While not necessary to decide the Defendants' pending Motions, Finley's contract may be
relevant trial evidence as to the need for formal approval by the Board for such "consulting" agreements.

21

Martin's claim that the closure of the Wells Fargo account violated any legally cognizable interest of Martin," and that "Finley's legitimate inquiries about Martin's wrongful expenditures, which Martin has admitted of record, do not form a basis for relief against Finley." (Doc. 125 at 17-18). Defendant Albanese contends that he was not involved in the closure of the bank account, or the negotiations for Martin's resignation from the company and termination of the Consulting Agreement. (Doc. 122 at 16-17). Both assert that Martin decided to terminate his own contract by voluntarily deciding to resign as Med-Dev Chairman because of the unauthorized expenses issue. (Docs. 122 at 16-17, 125 at 17-18).

Martin responds that there is a clear dispute of material fact regarding Finley and Albanese's involvement with the decision to close the Wells Fargo bank account, citing emails and testimony from Finley indicating that he discussed closing the account with Albanese and that Finley "did not act unilaterally in any of these capacities in dealing with any of these issues."[8] (Docs. 112-3 at 33:11-13, 128-20 at 3, 129 at 5, 145 at 5). Martin further argues that his resignation from the Med-Dev Board in April 2014 is a "smoke screen" raised by Finley and Albanese to avoid liability for their tortious interference because the Consulting Agreement was effectively terminated four months earlier with the closure of the Wells Fargo bank account. Further, Martin contends that his resignation was

---

[8] On this factual dispute and others, Martin has cited in his Oppositions to portions of the trial transcript from the Delaware Chancery Court matter, which are attached to the Defendants' Statement of Undisputed Material Facts. (See, e.g., Doc. 109-1 at 90-104). However, Martin often cites to pages in the transcript that were not included in the excerpt included in the record. As a result, the Court will not consider these omitted pages in its evaluation of the factual record.

later deemed ineffective by the Delaware Chancery Court because a condition subsequent to Martin's resignation was not fulfilled, i.e., the appointment to the Board of Lipes and Rainey. (Docs. 109-1 at 121-22, 145 at 6).

Although they are not identified as such, Finley and Albanese's "culpable conduct" arguments lump together the remaining elements of tortious interference—purposeful action to interfere with a contract, taken without privilege or justification, that results in actual legal damages. *CGB Occupational Therapy*, 357 F.3d at 384. These arguments fail to convince the Court that the entry of summary judgment is appropriate.

First, the Court will not rule as a matter of law that the closing of the Wells Fargo bank account, from which Martin withdrew his monthly fee under the Consulting Agreement, is not an actionable interference with a contract. Tortious interference with contract does not have "a technical requirement as to the kind of conduct that may result in interference . . . [i]nterference with the third party's performance may be by prevention of the performance . . . [such as] by depriving him of the means of performance." Restatement (Second) of Torts § 766 cmt. k. Preventing Med-Dev from paying Martin by closing the Wells Fargo account is, on its face, "depriving [Med-Dev] of the means of performance." *Id.* Additionally, while Albanese may not have been the individual who personally closed the Wells Fargo bank account, Martin has pointed to material in the factual record that suggests that Albanese was involved in the decision to close the account. (*See* Docs. 112-3 at 33:11-13, 128-20 at 3, 129 at 5, 145 at 5). Martin has also pointed to portions of the factual record to support his

claim that Finley and Albanese had the aim of pushing him out of Med-Dev, and the Court also takes notice of portions of the record that identify a factual dispute between the parties on this issue. (See Docs. 109-2 at 40, 128-13 ¶¶ 10-13, 128-16 ¶¶ 6, 14-16, 128-34 at 2, 129 at 7, 144-34 at 23:24 to 24:2,145 at 7-8). This is sufficient to preclude summary judgment on the grounds that Finley and Albanese did not intend to interfere with the Consulting Agreement. Restatement (Second) of Torts § 766 cmt. j (describing that an actor is liable if actions to interfere with contract are taken with the "primary purpose of interfering with the performance of the contract," if the actor "desires to interfere, or if the actor "knows that interference is certain or substantially certain to occur" even if it is not the primary purpose of the action).

Further, while a court can rule as a matter of law that an actor is privileged to take an action that would otherwise be unlawful interference with a contract, see Dempsey v. Bucknell Univ., 76 F. Supp. 3d 565, 587 (M.D. Pa. 2015), Finley and Albanese only point to the qualified privilege afforded to agents of a principal, as purported corporate officers of Med-Dev. As subsequently discussed, infra Section IV.A.3, Martin raises factual disputes regarding whether Finley and Albanese were acting within the scope of their authority when they purportedly took actions to interfere with the Consulting Agreement. Evaluating other potential justifications for interference with a contract, such as Finley's brief reference to his "legitimate inquiries about Martin's wrongful expenditures," (Doc. 125 at 18), are better resolved by a jury and are thus inappropriate for judicial resolution on summary judgment.

Restatement (Second) of Torts § 767 cmt. l. ("[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.").

Finally, the parties agree that Martin ceased being paid under the Consulting Agreement in January 2014. While they may dispute the importance of Martin's later proffered resignation in April 2014, the failure of Martin to be paid under the Consulting Agreement starting in January 2014 constitutes "actual legal damages" as required by the tort. See Restatement (Second) of Torts § 774A(1)(a) (liability for damages for "the pecuniary loss of the benefits of the contract").

Accordingly, the Court will deny the entry of summary judgment on these grounds asserted by Finley and Albanese.

### 3. EXISTENCE OF A THIRD-PARTY

Finley and Albanese next raise a legal defense against Martin's tortious interference claim by arguing that they are not "third parties" that could have interfered with the Consulting Agreement.[9] Instead, they contend that as corporate officers of Med-Dev, they should be considered the same as Med-Dev. (Docs. 122 at 17-18, 125 at 18-19). They further assert that there is "no evidence that [either] acted outside the course and scope of his role as a director of Med-Dev." (Docs. 122 at 18, 125 at 19).

---

[9] The Court notes that it previously asked for briefing on this issue from the parties. (Doc. 66). Only Martin complied. (Doc. 72).

With respect to Albanese, Martin responds that there is a dispute of fact regarding whether "Albanese was a member of the Med-Dev Board of Directors at all times between January 16, 2014 and April 19, 2014." (Doc. 128-3 at 2, 128-4 at 3, 128-16 ¶ 11, 129 at 5-6). With respect to both Finley and Albanese, Martin further argues that there is a dispute of fact regarding whether each was acting within the scope of his authority as a director of Med-Dev when both took actions to allegedly interfere with Martin's Consulting Agreement. (Docs. 129 at 6-8, 145 at 6-9). Martin points to portions of the factual record to support his assertion that both Finley and Albanese "acted with personal animus" and "contrary to Med-Dev's interest" because they knew or should have known that Martin was paid his consulting fees from the Wells Fargo account to Martin's company, Scotland Yarns, LLC, and that Finley was aware that the payment to Mauro Savo was a mistake and that Martin offered to rectify the situation by offsetting the payment against fees he was owed. (Docs. 109-2 at 40, 112-1 at 43:17-23, 128-13 ¶¶ 10-13, 128-16 ¶¶ 6, 14-16, 128-34 at 2, 129 at 7, 144-34 at 23:24 to 24:2, 145 at 7-8).

Despite reaching different conclusions, the parties correctly encapsulate the legal standard in their argument. "Under Pennsylvania law, a claim for tortious interference will survive only if a defendant is not a party to the contract alleged to have been tortiously interfered with." See, e.g., Daniel Adams Assocs., Inc. v. Rimbach Publ'g., Inc., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987). "The actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract." CGB

*Occupational Therapy*, 357 F.3d at 385. "The agent's privilege is qualified . . . because it applies only when the agent is acting within the scope of its authority." *Id.* Corporate officers, as agents, are thus typically immune from a tortious interference claim brought by a plaintiff who has a contract with the corporation that was allegedly interfered with by the corporate officer. *See, e.g., id.* at 385-88; *Labalokie v. Capital Area Intermediate Unit*, 926 F. Supp. 503, 509 (M.D. Pa. 1996). However, in situations when the "'sole motive in causing the corporation to breach the contract is actual malice toward the plaintiff, or if the officer's conduct is against the corporation's interest,'" the "agent acts outside the scope of his employment." *Tisone v. Berardino*, Civil Action No. 16-167, 2016 WL 7404556, at \*8 (W.D. Pa. Dec. 22, 2016) (quoting *Duran v. Cty. of Clinton*, No. 4:14-CV-2047, 2015 WL 5675580, at \*11 (M.D. Pa. Sept. 25, 2015)).

While it is a close call, the Court finds that the highly contested factual record leads it to conclude that Finley and Albanese have not established, as a matter of law, that they were acting within the scope of their employment. In other cases from the Third Circuit and the Court's sister districts where courts have found that agents were acting in the scope of their employment, the factual record has been much more definitive than the instant case. For example, in *CGB Occupational Therapy*, 357 F.3d 375 (3d Cir. 2004), there was an uncontested agreement between the defendant-appellant, a managing agent for two Pennsylvania nursing home facilities, and the third party corporation which owned the facilities that gave the managing agent the express authority to terminate contracts in the

27

third party corporation's name. *Id.* at 386. Thus, the Third Circuit found that the managing agent was acting within the scope of its authority when it terminated its contract with the plaintiff-appellee, a provider of therapy services to the nursing home facilities. *Id.* Similarly, in *Wagner v. Tuscarora School District*, No. Civ. A. 1:04-CV-1133, 2006 WL 167731, (M.D. Pa. Jan. 20, 2006), in granting summary judgment to defendants in a tortious interference case, the court found that the record did not contain any evidence suggesting malice on the part of the defendants, employees or agents of a school district, against the plaintiff, a teacher in the school district. *Id.* at *13.

As noted above, Martin has pointed to evidence in the record that at least raises a dispute as to the motivations of Finley and Albanese in closing the Wells Fargo bank account and taking other actions that allegedly led to the termination of the Consulting Agreement. (Docs. 109-2 at 40, 112-1 at 43:17-23, 128-13 ¶¶ 10-13, 128-16 ¶¶ 6, 14-16, 128-34 at 2, 129 at 7, 144-34 at 23:24 to 24:2,145 at 7-8). The disputed inner-workings of a small, private corporation like Med-Dev creates a factual morass on this issue that must be resolved by a jury rather than by this Court.

However, the Court also finds that the contested factual ground will not be unlimited at trial. The Court rejects Martin's argument that there is a dispute of fact with respect to whether Albanese was a member of the Board starting in January 2014, as this was an issue previously decided in the Delaware Chancery Court matter. (Doc. 109-1 at 125, 127-28). In that matter, Martin also argued that "at some point after his January 16 appointment,

28

Albanese resigned from the Board." (*Id.* at 125). Martin raised this issue as part of his case-in-chief to invalidate Albanese's position on the Med-Dev Board in order to establish his own entitlement to the Chairman position. (*Id.* at 109, 125). The Delaware Chancery Court found that "the evidence does not support [Martin's] conclusion," and that "Albanese validly was appointed to the Board on January 16, 2014 and did not resign afterwards." (*Id.* at 125).

Under the principles of issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct. 411, 66 L. Ed. 2d 308 (1980) (citing *Montana v. U.S.*, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979)). "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana*, 440 U.S. at 153-54. The Court will apply Delaware preclusion law regarding this issue, as it was the state in which the previous judgment was entered.[10] *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006) (citing *Lance v. Dennis*, 546 U.S. 459,

---

[10] This is not the only instance in which the Delaware Chancery Court case touches on the instant matter. Defendants raise an issue preclusion defense with respect to Martin's abuse of process claim based on the Delaware proceedings. However, as the Court will later explain in denying Defendants' abuse of process issue preclusion defense, *infra* Section IV.B.1, the issue considered by the Delaware Chancery Court with respect to the LCDA investigation was not precisely the same as that considered here. There was also a different evidentiary burden regarding the particular issue.

29

466 (2006) ("Congress has directed federal courts to look principally to state law in deciding what effect to give state-court judgments.")); *see also Ciarrocchi v. Kennedy Mem'l Hosp.*, 378 F. App'x 239, 241 (3d Cir. 2010) (court may raise issue preclusion *sua sponte*) (citing *Arizona v. California*, 530 U.S. 392, 412-13 (2000)).

Delaware courts utilize the widely-adopted four factor test to determine if issue preclusion, also known as collateral estoppel, applies to bar relitigation of an issue: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. Super. Ct. 1993)). All of the factors are present with respect to the issue of Albanese's purported resignation: (1) it was an issue raised in the previous action; (2) the Delaware Chancery Court produced a final judgment on the merits; (3) the doctrine is being invoked against Martin, who was a party to the prior adjudication; and (4) Martin had a full and fair opportunity to litigate the issue in the prior action, as he raised the issue with the Chancery Court and engaged in discovery regarding the issue as part of his case-in-chief. (Doc. 109-1 at 109, 125 (noting full trial and oral argument conducted in Delaware Chancery Court)); *see* Restatement (Second) of Judgments § 29 cmt. d (difference in discovery procedures and "plenary as distinct from summary hearing"

may prevent issue preclusion in second action); *Messick v. Star Enter.*, 655 A.2d 1209, 1213 (Del. 1995) (citing the Restatement with favorability). Thus, Martin will be precluded from contesting this issue at trial.

### 4. STATUTE OF LIMITATIONS DEFENSE

Finley and Albanese next argue that Martin's tortious interference claim should be time-barred because "the gravamen of Martin's contractual interference claim is defamation. Thus, the defamation statute of limitations applies." (Docs. 122 at 20-21, 125 at 21); *see Evans v. Phila. Newspapers, Inc.*, 601 A.2d 330, 333-34 (Pa. Super. Ct. 1991). They direct the Court to disregard Martin's use of the term "interference" in his Complaint and instead focus on paragraphs 41-46 of the Complaint, where, they state, "he claims <u>Defendants made false allegations against him</u> causing him to voluntarily resign from the company." (Docs. 122 at 20, 125 at 21) (emphasis in Finley and Albanese's brief). Because the statute of limitations for defamation in Pennsylvania is one year, 42 Pa. Stat. and Cons. Stat. Ann. § 5523(1), and because "Martin waited over 17 months after his resignation from Med-Dev in April 2014 before filing his lawsuit on August 20, 2015," Finley and Albanese contend that Martin's claim is time-barred. (Docs. 122 at 20-21, 125 at 21).

Martin responds that the cases cited by Finley and Albanese in support of their statute of limitations argument, including *Evans*, are inapposite because they all involved factual allegations that made clear that the tortious interference claims were solely based on defamatory conduct. (Docs. 129 at 8-9, 145 at 9-10). Martin states that his tortious

31

interference claim is based on "substantially different conduct [than his defamation claim],

conduct that is irrelevant to the defamation claim and that started prior to the defamation

and ended after the defamation." (Docs. 129 at 9, 145 at 10). Martin alludes to specific

conduct:

> It includes Finley's mission to expel Martin from the Company to hide his own
> incompetence, Finley's recruitment of Albanese, Moore, and Minora, to assist
> him in that pursuit, the Defendants' actions in closing the Med-Dev bank
> account at Wells Fargo Bank—thereby ceasing all consulting payments owed
> to Martin under the Agreement and effectively terminating his consulting
> contract, and Defendants refusal to turn over operating and financial records
> to the company after Martin's return to the Board in 2016.

(Docs. 129 at 9, 145 at 10).

The Court agrees with Martin that his tortious interference and defamation claims are

distinct, and, thus, his tortious interference claim is not time-barred. Federal courts in this

Circuit applying Pennsylvania law have indeed found that when a plaintiff's tortious

interference claim "exist[s] solely because of . . . defamatory statements [and] [i]f the trial

court finds that there is no independent basis for the tortious interference claim[], absent

defamatory statements, the court must apply the one year statute of limitations to both

claims for relief." *Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 1010 (E.D.

Pa. 1997) (quoting *Hurst v. Beck*, Civ. A. No. 91-2492, 1992 WL 396592, at \*4 (E.D. Pa.

Dec. 17, 1992) (examining *Evans*)); *McClenaghan v. Turi*, 567 F. App'x. 150, 156 (3d Cir.

2014). As Martin states, the cases cited by Finley and Albanese in their Motions all involved

32

such a situation where the tortious interference or analogous claim had no independent basis absent defamatory statements.

For example, *Evans*, 601 A. 2d 330 (Pa. Super. Ct. 1991), involved a defendant newspaper publishing an article that contained allegedly defamatory statements that were later orally repeated by the defendant reporter that resulted, according to the plaintiff, in the loss of funding to the organization headed by the plaintiff. *Id.* at 331-32, 334. The Pennsylvania Superior Court held that "the underlying wrong which the complaint alleges is the defamation by publication of a libelous report, and the claim of injury set out in each count springs from the act of publication." *Id.* at 333. *Auld v. Mobay Chemical Co.*, 300 F. Supp. 138 (W.D. Pa. 1969), involved a defendant corporation and its officers making allegedly defamatory statements about the plaintiff, a former employee of the corporation, to the IRS and a prospective employer that the plaintiff alleged constituted a conspiracy to defame the plaintiff and conspiracy to injure him in his business or profession. *Id.* at 140. The court applied the one year statute of limitations to the conspiracy claims because the cause of action for all claims was for injury or damage to the reputation of the plaintiff. *Id.* at 141. And *Pittsman v. Perrone*, No. 11 CV 1235, 2013 WL 1465621, 29 Pa. D. & C. 5th 15 (Pa. Ct. Com. Pl. Apr. 11, 2013), solely involved an alleged defamatory communication sent by a defendant doctor to the plaintiff's potential employer, which the plaintiff alleged constituted defamation and tortious interference. *Id.* at \*6.

33

In contrast to those cases, here, Martin's tortious interference claim is only tangentially linked to his defamation claim in the sense that he alleges that Finley and Albanese used false allegations of unauthorized expenses as an improper excuse to shut down the Wells Fargo bank account and take actions to force him out of Med-Dev when they had other improper motives. However, his tortious interference claim does not rely upon the allegedly defamatory August 2014 Newsletter and January 2015 Manifesto which are the subjects of his defamation claim. As a result, the Court will apply the two year statute of limitation for tortious interference and deny Finley and Albanese summary judgment on their time-bar argument. *See* 42 Pa. Stat. and Cons. Stat. Ann. § 5524(3); *CGB Occupational Therapy*, 357 F.3d at 383.

## 5. GIST OF THE ACTION DEFENSE

In their final argument against Martin's tortious interference claim, Finley and Albanese raise a "gist of the action" defense and assert that Martin's claim is actually for breach of contract of the Consulting Agreement and is not a tort claim. (Docs. 122 at 21-23, 125 at 21-23). They contend that:

> Martin's claim is a disguised breach of contract action due to Med-Dev's failure to pay him any consulting fees since January 2014 . . . [and] is also an attempt to pierce the corporate veil and impose liability against a select group of directors (3 out of 6), who served in 2014.

(Docs. 122 at 22, 125 at 22-23). They note that the Delaware Chancery Court found that the reason that Martin agreed to resign from Med-Dev in April 2014 was due to misrepresentations by Med-Dev's counsel, Attorney Tomasek, and that Martin should have

34

sued Med-Dev for breach of the Consulting Agreement instead of them for tortious interference. (Docs. 122 at 22, 125 at 23).

In response, Martin argues that he "did not allege a breach of contract claim against any of the Defendants in this action simply because he did not have a contract with any of the Defendants." (Docs. 129 at 10, 145 at 11). Martin further states that he did not sue other members of the Med-Dev Board because he did not believe that they "participated in, or had knowledge of, the personal attack the Defendants were plotting and executing against him." (Docs. 129 at 10, 145 at 11). Finally, Martin posits that applying the gist of the action doctrine to his tortious interference claim should result in a finding that the claim is "a stand-alone claim that does not arise solely from the contract": "[w]hile Med-Dev had contractual obligations to pay Martin his monthly consulting fees under the Agreement, the substance of Martin's tortious interference claims are not that Med-Dev failed to meet these obligations, but rather that the Defendants, intending to harm Plaintiff, interfered with the Agreement, without justification or privilege, and caused Martin to suffer damages." (Docs. 129 at 11, 145 at 12).

"Pennsylvania courts apply the gist of the action doctrine 'to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract.'" *Bull Int'l, Inc. v. MTD Consumer Grp., Inc.*, 654 F. App'x 80, 101 (3d Cir. 2016) (quoting *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 60 (Pa. 2014)). In *Bruno v. Erie Insurance Co.*, 106 A.3d 48 (Pa. 2014),

35

the Pennsylvania Supreme Court attempted to clarify what distinguishes a tort claim from a

breach of contract claim:

> The general governing principle which can be derived from our prior cases is
> that our Court has consistently regarded the nature of the duty alleged to
> have been breached, as established by the underlying averments supporting
> the claim in a plaintiff's complaint, to be the critical determinative factor in
> determining whether the claim is truly one in tort, or for breach of contract. In
> this regard, the substance of the allegations comprising a claim in a plaintiff's
> complaint are of paramount importance, and, thus, the mere labeling by the
> plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the
> facts of a particular claim establish that the duty breached is one created by
> the parties by the terms of their contract—i.e., a specific promise to do
> something that a party would not ordinarily have been obligated to do but for
> the existence of the contract—then the claim is to be viewed as one for
> breach of contract. If, however, the facts establish that the claim involves the
> defendant's violation of a broader social duty owed to all individuals, which is
> imposed by the law of torts and, hence, exists regardless of the contract, then
> it must be regarded as a tort. Although this duty-based demarcation was first
> recognized by our Court over a century and a half ago, it remains sound, as
> evidenced by the fact that it is currently employed by the high Courts of the
> majority of our sister jurisdictions to differentiate between tort and contract
> actions. We, therefore, reaffirm its applicability as the touchstone standard
> for ascertaining the true gist or gravamen of a claim pled by a plaintiff in a civil
> complaint.

*Id.* at 68-69 (internal citations omitted). In *Bruno*, the court evaluated a negligence claim

brought by the plaintiff homeowners against their homeowners' insurance company and

retained engineer for statements they made advising the plaintiffs that a mold issue in their

home was not serious, which was relied upon by the plaintiffs to their detriment, leading to

health problems and the home being rendered uninhabitable. *Id.* at 52-53. The court ruled

that although there was an insurance policy between the plaintiffs and the company that

required the company to pay up to $5,000 to the plaintiffs for investigating the presence of

mold and pay for property damage caused by mold, the policy was not at issue, because the insurance company did pay the $5,000 to the plaintiffs. *Id.* at 70. Instead, the plaintiffs' allegations concerned the negligent actions taken while the insurance company was performing its contractual obligation to perform the investigation, and so, "the [insurance] policy in this instance merely served as the vehicle which established the relationship [between the parties], during the existence of which [the insurance company] allegedly committed a tort." *Id.* at 70-71. Thus, the gist of the action doctrine did not bar the negligence claim. *Id.*

Applying the legal principles elucidated in *Bruno* to this matter, the Court finds that the gist of the action doctrine does not bar Martin's tortious interference claim. First, unlike the cases cited by Finley and Albanese where the gist of the action doctrine was found to apply, here, one of the contracting parties, Med-Dev, is not a named party in this lawsuit. This negates the concern raised by Finley and Albanese, and cited by Pennsylvania courts, that "[t]o permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions." *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 582 (Pa. Super. Ct. 2003) (quoting *Bash v. Bell Tel. Co. of Pa.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)). Finley and Albanese contend that Martin's pleading strategy—naming them as defendants instead of Med-Dev—is based on a fiction, (Docs. 122 at 22-23, 125 at 22-23), and that "in this situation, the directors and company should be viewed as one and the same," (Doc. 137 at

8). However, as previously discussed, Martin has pointed to material in the factual record to support his claim that it was not Med-Dev that breached the contract, but rather Finley and Albanese, as third parties operating outside the scope of their authority, who interfered with full execution of the contract. (*See* Docs. 109-2 at 40, 112-1 at 43:17-23, 128-13 ¶¶ 10-13, 128-16 ¶¶ 6, 14-16, 128-34 at 2, 129 at 7, 144-34 at 23:24 to 24:2, 145 at 7-8). While Martin perhaps could have brought a breach of contract action directly against Med-Dev, in factual circumstances such as these, where the inner-workings of an apparently informally-run, small, private corporation are highly disputed, the Court cannot rule as a matter of law that he should have pursued his lawsuit in that fashion. *See* Restatement (Second) of Torts § 766 cmt. v ("The fact that the plaintiff has an available action for breach of contract against the third person does not prevent him from maintaining an action under the rule stated in this Section against the person who has induced or otherwise caused the breach.").

Secondly, the duty here alleged to have been breached by Finley and Albanese is one that is "a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract." *Bruno*, 106 A.3d at 68. As noted by the Pennsylvania Supreme Court in *Adler*, the common law has long:

recognized an action in tort for an intentional, unprivileged interference with contractual relations. It is generally recognized that one has the right to pursue his business relations or employment free from interference on the part of other persons except where such interference is justified or constitutes an exercise of an absolute right: Restatement, Torts, s 766.

38

*Adler*, 393 A.2d at 1182 (quoting *Birl v. Phila. Elec. Co.*, 167 A.2d 472, 474 (Pa. 1961)). Examining "the substance of the allegations comprising [the] claim in [the] plaintiff's complaint [which is] of paramount importance," *Bruno*, 106 A.3d at 68, Martin has alleged that Finley and Albanese "grew increasingly hostile towards Martin in early 2014 and sought to oust him from Med-Dev by manufacturing a controversy concerning Martin's business expenses," and "[a]fter manufacturing the controversy regarding Martin's expenses, Defendants sought additional ways to oust Martin from the Company." (Doc. 1 ¶¶ 18, 35). Martin alleges that "[h]e stopped receiving his monthly consulting fees after Defendant Finley closed the corporate account," (*id.* ¶ 32), and that Finley and Albanese improperly filed a criminal complaint with the LCDA with the intent of driving Martin out of Med-Dev, including threatening criminal action if he did not sign a settlement agreement relinquishing his interest in Med-Dev, (*id.* ¶¶ 58-100). These allegations sufficiently state a claim for tortious interference and, as previously stated, are supported by (admittedly disputed) material in the factual record. Therefore, the Court will deny summary judgment on these grounds, and because the Court has rejected all of Finley and Albanese's other arguments against Martin's tortious interference claim, the claim will proceed to trial.

### B. ABUSE OF PROCESS (COUNT III – ALL DEFENDANTS)

In their Motions, Finley, Albanese, and Minora all make similar arguments to establish that they are entitled to summary judgment on Plaintiff's third claim, abuse of process. "The tort of 'abuse of process' is defined as the use of legal process against

another 'primarily to accomplish a purpose for which it is not designed.'" *Rosen v. Am.*

*Bank of Rolla,* 627 A.2d 190, 192 (Pa. Super. Ct. 1993) (quoting Restatement (Second) of

Torts § 682).

> The gravamen of the misconduct for which the liability stated [under this tort] is
> imposed *is not the wrongful procurement of legal process or the wrongful
> initiation of criminal or civil proceedings;* it is the misuse of process, no matter
> how properly obtained, for any purpose other than that which it was designed to
> accomplish.

*Id.* (quoting Restatement (Second) of Torts § 682 cmt. a) (emphasis added)). To succeed

on an abuse of process claim,

> the plaintiff must show some definite act or threat not authorized by the
> process, or aimed at an objective not legitimate in the use of the process . . . ;
> and there is no liability where the defendant has done nothing more than carry
> out the process to its authorized conclusion, even though with bad intentions.

*Lerner v. Lerner,* 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008) (quoting *Shiner v. Moriarty,*

706 A.2d 1228, 1236 (Pa. Super. Ct. 1998)) (internal alterations omitted). "The gist of an

action for abuse of process is the improper use of process after it has been issued, that is, a

perversion of it . . . ." *Publix Drug Co. v. Breyer Ice Cream Co.,* 32 A.2d 412, 415 (Pa.

1943) (quoting *Mayer v. Walter,* 64 Pa. 283, 285 (Pa. 1870)). The presence or absence of

probable cause is irrelevant to a claim for abuse of process, nor does the plaintiff have to

prove that the underlying action terminated in his favor. *Smith v. Wambaugh,* 887 F. Supp.

752, 757 (M.D. Pa. 1995). "Quite simply, a court should ask whether there has been a

'perversion' of the process, or, whether a legal process has been used 'as a tactical weapon

to coerce a desired result that is not the legitimate object of the process.'" *Gen.*

*Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 307 (3d Cir. 2003) (quoting *McGee v. Feege*, 535 A.2d 1020, 1026 (Pa. 1987)).

Defendants raise several arguments against Martin's abuse of process claim, although they do not join together on all of them. All Defendants argue that Martin's abuse of process claim is barred by collateral estoppel because it was essentially denied in Martin's previous Delaware Chancery Court suit. (Docs. 122 at 26-27, 123 at 14-16, 125 at 26-28). Finley and Albanese also attempt to shift responsibility to Minora and argue that it was he, not they, who initiated the criminal complaint with the LCDA, and thus, they have not engaged in a "definite act or threat" as required by the tort. (Docs. 122 at 24, 125 at 24-25). Additionally, Finley, Albanese, and Minora argue that the procurement of the legal process, which included the search warrants issued by the LCDA, was not improper, and that it was not intended to coerce Martin to give up his Med-Dev shares. (Docs. 122 at 24-25, 123 at 12-14, 125 at 25-26). The Court will address each argument in turn, and will deny the entry of summary judgment on Martin's abuse of process claim.

## 1. COLLATERAL ESTOPPEL/ISSUE PRECLUSION

All Defendants argue that Martin's abuse of process claim is barred by collateral estoppel (issue preclusion), because it was an issue that was litigated and decided in Martin's previous Delaware Chancery Court case. They argue that "[t]he Delaware Chancery Court held Martin is not entitled to an award of legal fees based on the actions of Med-Dev and Finley during the LCDA investigation." (Docs. 122 at 27, 125 at 27). Minora

41

further contends that "[t]he Delaware Chancery Court denied Martin's claim that Med-Dev and Finley acted in bad faith by proposing a settlement under which they would drop the criminal charges against Martin in exchange for a relinquishment of his interest in the company." (Doc. 123 at 15). Martin responds that Defendants do not satisfy any of the elements of issue preclusion, most notably that the issue of the impropriety of the LCDA investigation was only considered for the purposes of fee shifting and that discovery has revealed essential documents that "were previously withheld in the Chancery Court matter." (Docs. 129 at 14-15, 143 at 8-10, 145 at 15-17).

As previously stated, the Court must look to Delaware issue preclusion doctrine in evaluating the parties' arguments.[11] *See supra* Section IV.A.3. Delaware courts look to four factors: "(1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action." *Betts*, 765 A.2d at 535. The issue decided in the prior action must be necessary to the outcome of the prior judgment. *Machin*, 642 A.2d at 1239 (citing *Chrysler Corp. v. New Castle Cty.*, 464 A.2d 75, 80 (Del. Super. Ct. 1983)); *see also*

---

[11] In their respective briefs, the parties both apply Pennsylvania issue preclusion doctrine, but as previously noted, the Court must look to the issue preclusion doctrine of the state in which the previous judgment was entered. *Turner*, 449 F.3d at 548. However, the Court notes that Pennsylvania and Delaware look to the same four factors. *See Nationwide Mut. Fire Ins. Co.*, 571 F.3d 299, 310 (3d Cir. 2009) (citing *Rue v. K–Mart Corp.*, 552 Pa. 13, 713 A.2d 82, 84 (1998)).

Restatement (Second) of Judgments § 27 cmt. h (if judgment not dependent on the determination of the issue, it is dicta and does not have preclusive effect).

However, even if an issue would otherwise be barred from relitigation by the doctrine, it is not precluded if the burden of proof on the issue in the initial action was higher than in the subsequent action. *TR Inv'rs, LLC v. Genger*, C.A. No. 6697-CS, 2013 WL 603164, at *15 & n.143 (Del. Ch. Feb. 18, 2013) (citing Restatement (Second) of Judgments § 28(4) (issue preclusion does not apply when "[t]he party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action")); *see also Grogan v. Garner*, 498 U.S. 279, 284-85 (1991) (same).[12] Thus, for example, if a party lost on an essential issue in the initial action under a clear and convincing burden of proof, it would not be precluded from raising that issue in a subsequent action with a preponderance of the evidence burden.

The Court finds that Defendants have not established all the elements of issue preclusion with respect to Martin's abuse of process claim. First, the Delaware Chancery Court did not determine the precise issue that is contested by the parties in the instant matter, the Defendants' abuse of process during the LCDA investigation, because the Chancery Court's consideration of the LCDA investigation never resulted in that ultimate

---

[12] The Court notes that the Delaware Chancery Court in *Genger* did apply issue preclusion to the defendant, even though a higher burden of proof applied with respect to the issue that was litigated by the defendant in the previous matter. However, the *Genger* Court noted that it was only doing so because the higher burden of proof was imposed by the previous court as a sanction for spoliation of evidence and contempt of court. Thus, allowing the defendant to claim issue preclusion in the new matter would have been rewarding him for his prior bad conduct and would essentially have rendered the previous sanction nugatory. *Genger*, 2013 WL 603164, at *15. Those unique circumstances do not apply here.

43

finding. As Martin points out, the Delaware Chancery Court's consideration of Finley's conduct in the LCDA investigation and during settlement negotiations was solely for the purpose of determining whether Finley's conduct constituted "bad faith" for purposes of awarding attorneys' fees. (See Doc. 109-1 at 126-27). The Chancery Court explicitly stated that "bad faith" only applies to "conduct taken during litigation rather than before it commences." (Id. at 126). Neither the LCDA nor Finley commenced litigation against Martin for his purported criminal acts regarding the diversion of Med-Dev funds. Thus, the Chancery Court's subsequent and extended discussion of Finley's conduct during the LCDA investigation, which could bear upon a determination whether such conduct constituted an abuse of process, was dicta: "*Even if the bad faith exception to the American Rule did permit fee-shifting based on pre-litigation conduct*, however, Defendants' complained-of actions here do not rise to the level of bad faith sufficient to justify an award of attorneys' fees." (Id. at 126-27) (emphasis added).

Further, the Chancery Court decided the issue under a different, higher evidentiary standard than is before the parties in this action. The Chancery Court applied to Martin "'the stringent evidentiary burden of producing clear evidence of bad-faith conduct.'" (Id.at 127 (quoting Marra v. Brandywine Sch. Dist., C.A. No. 5574-VCN, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012)). Here, Martin must prove his abuse of process claim under the traditional civil litigation burden of proof, preponderance of the evidence. Applying issue preclusion in these circumstances would be inappropriate, and so the Court will deny the

entry of summary judgment of the abuse of process claim on the grounds that it is barred by issue preclusion.

## 2. INVOLVEMENT OF FINLEY AND ALBANESE

Finley and Albanese next contend that Martin has no evidence that they "supplied any information to the LCDA, let alone false information. Rather, Minora initiated the criminal investigation of Martin on behalf of the corporation." (Docs. 122 at 24, 125 at 24-25). Albanese further argues that he was even less involved in the LCDA investigation than Finley, pointing to the absence of his name in the LCDA Incident Report as a source of information for the criminal complaint and that "there is no evidence that Albanese directed Finley or Minora on what information to supply to the LCDA." (Doc. 122 at 24). Finley and Albanese thus urge the Court to conclude that they did not engage in any "definite act or threat," as required by the tort.

Martin responds that there are "numerous questions of fact that preclude summary judgment on the part of any Defendants in this matter." (Doc. 145 at 13). He points to evidence in the record to identify factual disputes regarding Albanese's involvement with the decision to hire Minora, and the involvement of Albanese and Finley in conjunction with Minora with respect to the decision to allegedly threaten Martin with criminal charges to get him to sign the settlement agreement and give up his interest in Med-Dev. (Docs. 112 ¶ 108, 112-3 at 13:14-22, 23:16-24:8, 32:16-33:20, 128-21, 128-23 at 2, 128-25, 128-27 at 87:16-88:2, 89:13-16, 89:23-90:17, 128-28, 129 at 12-13, 145 at 13-15).

45

The Court finds that Martin has raised disputes of material fact to preclude granting summary judgment on Finley and Albanese's proposed grounds that they were not involved in a "definite act or threat." The Court also notes that Finley and Albanese's argument misconstrues the "definite act or threat" in question here, which is not the initial filing by Minora of a criminal complaint with the LCDA, but rather the alleged abuse of the legal process by using the threat of an arrest to extort a settlement from Martin. In its previous opinion adopting in part and rejecting in part Magistrate Judge Carlson's Report and Recommendation on Minora's Motion to Dismiss, (Doc. 64), the Court addressed this issue. While referencing only Minora, the reasoning also applies to Finley and Albanese:

As Plaintiff admits, the abuse of process claim began to accrue against Defendant Minora personally when Defendant Minora himself used the threat of the criminal proceedings as a means of coercing Martin to enter into a civil settlement." (Doc. 62, at 4). Thus, it is the final event, the use of the ongoing criminal investigation to leverage a favorable civil settlement, that, when applied in conjunction with the prior allegations, sufficiently alleges a perversion of process; i.e. the improper use of the criminal complaint and subsequent search warrants to achieve the allegedly unlawful and unethical objective of extracting a civil settlement.

(Doc. 64 at 3-4). As Martin has pointed to disputes in the factual record over the involvement of Finley and Albanese in the alleged threat, the Court will deny summary judgment on these grounds.

### 3. LEGITIMATE OBJECT OF THE PROCESS

All Defendants next argue that there was no abuse of process because there was no improper use of the process, as they contend they were not using it to seek to extort Martin.

46

Rather, they were seeking an independent investigation by the LCDA to determine if Martin had engaged in criminal conduct. (Docs. 122 at 24-25, 123 at 12-13, 125 at 25-26). They contend that the undisputed facts show that Martin had used Med-Dev funds without authorization, and that Martin raised the idea of agreeing to resign from Med-Dev in exchange for his entire interest in the company. (Docs. 122 at 24-25, 123 at 13, 125 at 25-26). Minora separately argues that there is no evidence that he "attempted to use his prior employment with the LCDA to sway the outcome of the LCDA investigation or to threaten Martin to give up his ownership interest in Med-Dev." (Doc. 123 at 13). Finley and Albanese also argue that "[a] judicial privilege extends to statements made to law enforcement for the purpose of initiating a criminal investigation." (Docs. 122 at 25, 125 at 25-26).

Martin responds that "the case at bar represents a textbook example of abuse of process by way of extortion." (Docs. 129 at 11, 143 at 4, 145 at 12). He states that evidence in the factual record indicates that all Defendants acted improperly in bringing the criminal complaint and using it as leverage to extract a settlement from him. Specifically, he points to Minora's deposition testimony, which he contends establishes that Minora did not do a detailed investigation before contacting the LCDA, (Doc. 117-7 at 7:17-8:15, 142-8 at 32:13-34:1, 44:5-19, 143 at 5-6), and other material in the record to support his claim that Finley and Albanese hired Minora with the intent of improperly using Minora's current or past connection with the LCDA to strengthen their purportedly unfounded case against

47

Martin, (Docs. 128-24 at 37:5-10, 128-25, 128-28, 129 at 12, 142-13 at 46:21-47:4, 145 at

13). He further asserts that Minora played a key role in the abuse of process, by

"indicat[ing] to Martin's counsel that Finley, Albanese, and Moore wanted Martin out of the

Company and they wanted a stock transfer whereby Martin would relinquish all his stock in

Med-Dev," (Doc. 143 at 6-7), and that Minora told Martin's counsel that, in exchange, his

clients would be willing to stop advocating for Martin's criminal prosecution. (Doc. 117-9 at

23:24-24:5, 142-13 at 28:9-21, 32:18-33:6, 35:4-7). He states that it was Defendants,

through Minora, who drafted the settlement agreement that falsely stated that the LCDA

believed that probable cause existed to charge Martin with criminal conduct, and that it was

Defendants who used the threat of such criminal prosecution to coerce Martin to enter into

the settlement agreement, despite knowing of the weakness of their case.[13] (Docs. 128-25,

---

[13] In his Responses to Defendants' Statements of Undisputed Material Facts, Martin cites Fed. R. Evid. 408 to argue that the Court should not consider the settlement negotiations between the parties. (See, e.g., Doc. 128 ¶ 102). The Court is puzzled by Martin's position, as he has put the settlement negotiations front and center in his arguments surrounding his abuse of process claim. Indeed, in the Delaware Chancery Court action, Martin sought to introduce settlement-related evidence in order to prove his bad faith claim regarding the LCDA investigation. (See Doc. 109-1 at 115 n.53). The Delaware Chancery Court properly allowed the settlement evidence, and the Court will do so here. The Rule 408 prohibition is cabined to prevent introduction of settlement evidence only to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). The Advisory Committee notes to Rule 408 emphasize that it does not bar introduction of settlement evidence when "the claim is based upon a wrong that is committed during the course of settlement negotiations." Fed. R. Evid. 408 advisory committee's note to 2006 amendment (citing Uforma/Shelby Bus. Forms, Inc. v. NLRB, 111 F.3d 1284 (6th Cir. 1997)); see also Am. Eagle Outfitters, Inc. v. Lyle & Scott Ltd., 644 F. Supp. 2d 624, 642-43 (W.D. Pa. 2008) (citing Uforma), aff'd in part & rev'd in part on other grounds, 584 F.3d 575 (3d Cir. 2009). Additionally, Rule 408 allows the Court to admit settlement negotiation evidence if it is admitted for the purpose of "proving a witness's bias or prejudice." Fed. R. Evid. 408(b). As this is the crux of Martin's claim—that Defendants improperly conducted and used the settlement talks and offers as an unlawful threat against Martin and are now claiming that they did not do so—the Court will reject Martin's argument that it cannot consider the negotiations in its evaluation of the record.

129 at 13, 142-12 at 58:22-59:24, 142-13 at 35:14-21, 43:1-11, 142-14 at 3, 143 at 7-8, 145

at 14-15). Martin summarizes his view of the facts in his Opposition:

> At no time did Albanese, Finley, Moore, or Minora attempt to do any proper
> investigation, offer Martin any chance to explain or justify expenses, nor did
> they seek reimbursement; rather, they sought to compel Martin to forfeit his
> role, his fees and his shares of stock in the Company or they were going to
> bring criminal charges.

(Doc. 143 at 7).

The Court will not grant the entry of summary judgment on Defendants' arguments

that the criminal investigation was initiated and conducted with a proper purpose that is not

an abuse of process. While the parties apparently agree that Martin did, on at least two

occasions, improperly use Med-Dev funds, the Court finds that Martin has identified

numerous factual disputes raised with respect to the use of an alleged threat of criminal

prosecution to coerce Martin into signing the settlement agreement. There are numerous

disputed issues of material fact that remain for trial, including: the true origins of the decision

to go to the LCDA to file the criminal complaint and the motivations of Finley and Albanese,

to the extent they made that decision; Minora's knowledge of Finley and Albanese's

motivations; and the sequence and nature of the settlement discussions between the

parties, including who initiated and broached the idea of a civil settlement as a means of

resolving the criminal investigation.

Additionally, as Magistrate Judge Carlson previously noted in his R&R addressing

Finley and Albanese's Motion for Judgment on the Pleadings, (Doc. 63):

49

> [W]e note that threatening a meritless criminal prosecution for the sole
> purpose of gaining leverage in a civil settlement is an ethically problematic
> practice which has been condemned by courts in the past. *Realuyo v. Diaz*,
> No. 98CV7684 (GBD), 2006 WL 695683, at \*2 (S.D.N.Y. Mar. 17, 2006).
> Moreover, this practice has been considered by state and county bar
> associations in Pennsylvania and is viewed as violative of Pennsylvania's
> standards of professional conduct. *Guidance Opinion Number* 88-20, 1988
> WL 236401, at \*1 (1988) ("the Committee is of the opinion that letters from
> lawyers threatening criminal prosecutions are inappropriate and that the tenor
> of the Rules prohibit them.").

(Doc. 63 at 27-28). Martin points to the communication from Defendants to his counsel

seeking his signature on the settlement agreement: "Mr. Martin has five days to accept or

reject this agreement as is. Failing that Med-Dev intends to seek criminal charges against

Mr. Martin." (Doc. 142-14 at 3, 145 at 12-13). The Court cannot say that no reasonable

juror could find it constitutes an improper threat of criminal prosecution.

Finally, Finley and Albanese's argument that the statements made to the LCDA to

initiate the criminal investigation are judicially privileged again miss the thrust of Martin's

argument, which is that the legal process was abused by Defendants when they threatened

criminal prosecution in an attempt to extort a settlement. Accordingly, the Court will deny

summary judgment on these grounds, and Martin's abuse of process claim survives.

50

## C. *DEFAMATION/FALSE LIGHT (COUNT IV - DEFENDANTS FINLEY AND ALBANESE)*

Finley and Albanese argue for summary judgment on Martin's fourth claim for defamation and false light invasion of privacy for publication of the August 2014 Newsletter and January 2015 Manifesto.[14] The Court will deny summary judgment on this claim.

"Under Third Circuit jurisprudence, the Court must apply a two-step approach when presiding over a defamation action. The Court must determine: '(1) whether the defendants have harmed the plaintiffs reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.'" *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 476 (E.D. Pa. 2010) (quoting *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1077 (3d Cir.1985) (internal quotation marks omitted)). Here, Finley and Albanese have not raised a First Amendment defense, nor does the Court find *sua sponte* that one would apply, and thus, the Court's analysis will focus on the Pennsylvania state law elements of defamation.

Under Pennsylvania law, to establish a claim of defamation, a plaintiff has the burden of showing: "(1) The defamatory character of the communication[;] (2) Its publication by the defendant[;] (3) Its application to the plaintiff[;] (4) The understanding by the recipient of its defamatory meaning[;] (5) The understanding by the recipient of it as intended to be applied to the plaintiff[;] (6) Special harm resulting to the plaintiff from its publication[;] [and]

---

[14] The Court notes that Martin styled his defamation claim as one for defamation, defamation per se, libel, and false light, although in his Oppositions to Finley and Albanese's Motions, he only specifically addresses the defamation claim. (Doc. 1 ¶¶ 133-51).

51

(7) Abuse of a conditionally privileged occasion." 42 Pa. Stat. and Cons. Stat. Ann. §

8343(a); *see also Graboff v. Colleran Firm,* 744 F.3d 128, 135 (3d Cir. 2014). Once a

plaintiff has established these elements, the defendant bears the burden of proving "(1) [t]he

truth of the defamatory communication[,] (2)[t]he privileged character of the occasion on

which it was published [or] (3)[t]he character of the subject matter of defamatory comment

as of public concern." 42 Pa. Stat. and Cons. Stat. Ann. § 8343(b).

The tort of false light invasion of privacy is related to defamation. Pennsylvania has

adopted the Restatement (Second) of Torts standard, which "imposes liability on a person

who publishes material that 'is not true, is highly offensive to a reasonable person, and is

publicized with knowledge or in reckless disregard of its falsity.'" *Graboff,* 744 F.3d at 136

(quoting *Larsen v. Phila. Newspapers, Inc.,* 543 A.2d 1181, 1188 (Pa. 1988) (en banc)

(citing Restatement (Second) of Torts § 652E)); *see also Vogel v. W.T. Grant Co.,* 458 Pa.

124, 129 n.9, 327 A.2d 133 (1974).

"It can be difficult to distinguish between the tort of false light invasion of privacy and

the tort of defamation. Some commentators have characterized false light as 'the right to be

left alone,' whereas defamation protects one's interest in a good reputation, but the lines

between them can blur." *Fanelle v. Lojack Corp.,* No. CIV.A. 99-4292, 2000 WL 1801270,

at *9 (E.D. Pa. Dec. 7, 2000). However, there are several significant differences:

> First, false light requires only proof of the falseness of the communication; it
> does not require harm to reputation or any other social consequences
> inherent in a defamation action. Thus, where a publication is false and
> offensive to plaintiff but might not harm the reputation of plaintiff, plaintiff

would have a cause of action for false light, but likely would not be able to proceed with a defamation claim. Second, false light requires scienter, or at least reckless disregard, whereas defamation claims not involving public figures or matters of public concern require only a showing of negligence. *See Rush v. Phila. Newspapers, Inc.,* 732 A.2d 648, 654 (Pa. Super. Ct. 1999). Third, the communication must be highly offensive to a reasonable person in a false light claim, while there is no such requirement in a defamation suit. *See id.* Fourth, false light requires "publicity," meaning widespread dissemination, as opposed to mere "publication" under defamation. Commentators appear to agree that a false light claim presents a higher hurdle for plaintiff to surmount than a defamation claim.

*Id.* (internal citation omitted) (citing Rodney A. Smolla, *Law of Defamation,* Vol. 1, §

10:10 (2d ed. 2000)); *see also Graboff,* 744 F.3d at 138 n.8 (citing *Am. Future Sys.,*

*Inc. v. Better Bus. Bureau of E. Pa.,* 923 A.2d 389, 400 (Pa. 2007) ("explaining that a

party may be liable for defamation against a non-public figure if it acted

negligently")).

The Court's analysis will focus on only those elements of Martin's claims that are

contested by Finley and Albanese. First, Finley and Albanese contend that they did not

make the allegedly defamatory statements. Next, they raise the purported truth of the

statements and conditional privilege as affirmative defenses. Finally, they challenge

Martin's false light claim.[15]

---

[15] Finley and Albanese also make an argument with respect to the possible award of punitive damages for Martin's defamation claim, contending that Martin cannot prove "actual malice," knowledge of falsity or reckless disregard of the truth, to support punitive damages. (Docs. 122 at 33, 125 at 32-33). The Court will subsequently address this argument in conjunction with Finley and Albanese's later contention that punitive damages should not be allowed with respect to any of Martin's claims. *See infra* Section IV.E. However, the Court notes that Finley and Albanese's argument regarding punitive damages for defamation incorrectly conflates the term "actual malice," required to be shown by public figures seeking recovery in a defamation action, with "common law malice" required under Pennsylvania law to establish punitive

53

## 1. STATEMENTS OR PUBLICATIONS

Finley and Albanese first argue that they did not make the statements in the August 2014 Newsletter or January 2015 Manifesto. (Docs. 122 at 28-30, 125 at 29). Albanese states that Martin has not pointed to evidence in the factual record to support that Albanese was involved in making the statements. (Doc. 122 at 28-29). Finley contends that Med-Dev was the entity that made the statements. (Doc. 125 at 29). Martin responds by pointing to evidence in the factual record to attempt to raise factual disputes on this issue, including an August 2014 email from Finley to investors stating that a newsletter is attached and being sent "on behalf of the Board of Directors & management of Med-Dev Corp.", (Doc. 112-4 at 58), and an email from Albanese that appears to indicate that he reviewed a draft of the newsletter, (Doc. 109-2 at 141).

None of the parties cite to any legal authority to state what constitutes "publication" under Pennsylvania defamation law. Pennsylvania courts refer to the Restatement (Second) of Torts § 577(1) definition: publication is "communication intentionally or by negligent act to one other than the person defamed." *Flaxman v. Burnett*, 574 A.2d 1061, 1066 (Pa. Super. Ct. 1990); *see also Cushman v. Trans Union Corp.* 115 F.3d 220, 230 (3d Cir. 1997). In addition to direct publication, publication can also be procured, which requires the plaintiff to show that the "third party-defendant directed or participated in the publication

damages for defamation. *Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 375 & n.14 (E.D. Pa. 2003) (citing *Sprague v. Walter*, 656 A.2d 890, 923 (Pa. 1995)). Proving common law malice requires a showing of conduct that is "'outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others . . . conduct which is malicious, wanton, reckless, willful, or oppressive . . .'" *Sprague*, 276 F. Supp. 2d at 376 (quoting Restatement (Second) of Torts § 908(2)).

of the defamatory publication by another . . . [and] requires, at very least, evidence of some affirmative action on the part of the defendant." *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1043 (Pa. 1996). Thus, in *Ertel*, the Pennsylvania Supreme Court found that there was not publication by procurement with respect to the defendant writer of an allegedly defamatory report because the defendant did not take affirmative action to direct or participate in the decision of a newspaper to publish the report, "he merely failed to hinder its publication" after the newspaper reported contacted him and the defendant said "'I don't care what you do with [the report].'" *Id.* at 1043-44. In contrast, in *Byars v. School District of Philadelphia*, No. CIV. A. 12-121, 2015 WL 4876257 (E.D. Pa. Aug. 13, 2015), the Eastern District of Pennsylvania denied entry of summary judgment because it found a genuine issue of material fact with respect to publication by procurement. In that case, the Court analyzed allegedly defamatory statements made by the School District's Deputy Chief Communications Officer to the Philadelphia Enquirer on behalf of the School District. *Id.* at *10. The plaintiff cited evidence that showed that the Deputy Chief Communications Officer, Deputy Superintendent, and Chief Communications Officer communicated by email regarding a response to the newspaper article that contained the allegedly defamatory statements, and that the Deputy Chief Communications Officer "had only been on the job for three weeks . . . and would not have made the statements on behalf of the School District without direction from her supervisor." *Id.*

"By its nature, the question of whether there has been publication by the defendant is a question of fact for the jury." *Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 463 (Pa. 1984). The Court finds that Martin has raised a genuine factual dispute with respect to Finley and Albanese's involvement with publication of the Newsletter and the Manifesto such that they either directly published the statements or procured their publication. Martin points to evidence in the record suggesting that the two traded drafts and exchanged comments on both the Newsletter and Manifesto. With respect to Albanese's role, Albanese sent an email to Finley in January 2015 purportedly regarding the Manifesto in which he advised an addition to it: "I think we should mention Martin's – Nelcon folly and it's [sic] cost including legal fees resulting from his unilateral and cavalier decision making management style." (Doc. 128-29 at 4). A dispute with Nelcon is subsequently mentioned in the final version of the Manifesto. (*See* Doc. 109-2 at 134-35). Martin also points to an email from Albanese suggesting that he reviewed a draft of the Newsletter. (Doc. 109-2 at 141). And Martin also points to Finley's deposition testimony, where Martin asserts Finley testified that he did not act unilaterally with respect to any issues involving the discipline and ouster of Martin. (Doc. 112-3 at 33:11-13). Therefore, at the very least, Martin has raised a factual dispute with respect to whether Albanese "procured" the publication of the Newsletter and Manifesto from Finley, similar to the defendants in *Byars*.

Finley's attempt to characterize the Newsletter and Manifesto as having been published by Med-Dev rather than him is also unavailing. While his analysis of the issue is

56

sparse, Finley's stratagem appears to be framing the publication of the Newsletter and Manifesto to the Court as one of improper *respondeat inferior*, where the agent (Finley) is being held responsible for the actions of the principal (Med-Dev). *See Davis v. Hoffman*, 972 F. Supp. 308, 314 (E.D. Pa. 1997) ("Nurse Puchini, the agent of Dr. Hoffman, cannot be liable for his alleged intentional tort, under some sort of doctrine of *respondeat inferior*."); Restatement (Third) of Agency § 7.01 cmt. d ("[T]here is no principle of 'respondeat inferior.'"). However, as previously discussed, Martin has raised a genuine dispute of material fact as to whether Finley and Albanese were acting within the scope of their authority as corporate directors when they purportedly engaged in tortious conduct against Martin. Thus, there is a dispute over whether it was really Med-Dev, the corporation, acting through Finley and Albanese as its agents, when actions were taken to close the Wells Fargo bank account, seek Martin's departure from the Board, and publish the Newsletter and Manifesto.

Nevertheless, even if Finley and Albanese were acting within the scope of their authority when publishing the Newsletter and Manifesto, "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978); *see also Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) (describing Pennsylvania's "participation theory" of liability, which ascribes personal liability to corporate officers who "take[] part in the commission of a tort by the corporation" or when

57

they "specifically directed the particular [tortious] act to be done or participated, or cooperated therein") (citations omitted). Here, in the case of a small corporation that seems to have operated relatively informally, with numerous factual disputes as to the purported involvement of Finley and Albanese in taking actions against Martin, summary judgment is particularly inappropriate.

As a result, the Court will deny Finley and Albanese summary judgment on these grounds.

## 2. TRUTH OR PRIVILEGE DEFENSE

Finley and Albanese next argue that the statements in the Newsletter are substantially true or privileged. They contend that the allegedly defamatory statement in the Newsletter, that Martin was "forced to resign" from Med-Dev's Board after an "extensive internal investigation into the alleged mishandling/misappropriation of Med-Dev corporate funds" is substantially true because they state that "Martin admits that he would not have resigned but for Finley pushing the issue of his unauthorized expenses." (Docs. 122 at 30, 125 at 30). They also argue that they were conditionally privileged to make the alleged defamatory statements as corporate directors of Med-Dev acting in Med-Dev's interest because the statements "concerned allegations of wrongdoing by Martin as Chairman of Med-Dev, which could affect the shareholders and investors." (Docs. 122 at 31-32, 125 at 30-31). Finley and Albanese do not address the Manifesto, which contain additional alleged defamatory statements, including that Martin improperly failed "to disclose his indictment,

58

arrest and arraignment for Theft by Deception in Bergen County NJ on Thursday May 7, 2009" before entering into the Consulting Agreement. (Doc. 109-2 at 129).

Martin responds that Finley and Albanese had knowledge that the statements in the Newsletter and Manifesto were false. (Docs. 129 at 17-19, 145 at 18-20). In particular, Martin points to an email chain between Defendants where they discussed a possible retraction of "a prior statement that Martin was 'forced to resign.'" (Doc. 128-33 at 4). Martin also argues that Finley and Albanese acted with personal animus against Martin, outside the scope of their authority as corporate directors of Med-Dev, and against Med-Dev's interest, making their defamatory statements unprivileged. (Docs. 128-32 at 2, 4, 129 at 19, 145 at 18); *see also supra* Section IV.A.3.

Truth is an affirmative defense to defamation. 42 Pa. Cons. Stat. Ann. § 8343(b)(1). "A defendant may avoid liability for defamation if it shows that its statements were 'substantially true.'" *Graboff*, 744 F.3d at 136 (citations omitted). "The proof of truth must go to the gist or sting of the defamation." *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 15 (Pa. 1982) (quoting Sack, *Libel, Slander, and Related Problems* at 50-51, 137-38 (1980) (internal quotation marks omitted)). "The test is whether the [alleged] libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Dunlap*, 448 A.2d at 15 (internal quotations omitted). Determining the truth of an alleged defamatory statement is typically a matter for a jury. *Krochalis v. Ins. Co. of N. Am.*, 629 F. Supp. 1360, 1366 (E.D. Pa. 1985) (citing Restatement (Second) of

Torts § 617(b) (only "if the evidence is so overwhelming that any other conclusion would be unreasonable, the court may direct the jury to make the proper finding")).

Based on the factual record present, the Court does not find that no reasonable juror could find that the statements contained in the Newsletter and Manifesto are false. As an initial matter, Finley and Albanese do not address the statements in the Manifesto, and so they cannot assert the affirmative defense of truth with respect to those statements. However, with respect to the Newsletter, their contention that Martin has admitted that he was essentially "forced to resign" from Med-Dev exists in a contentious factual record.

Finley and Albanese's argument here hinges on Martin's characterization of his April 2014 resignation in the Complaint as an admission that he was forced to resign from the Med-Dev Board because of the unauthorized expenses issue: "By April 2014, Martin recognized that Defendants' false allegations [about his expenses] were distracting the company from its mission. To end the distractions and allow Med-Dev to move forward, Martin agreed to resign from the company contingent on Edward Lipes and Gregory Rainey being appointed to the Board." (Doc. 1 ¶¶ 45-46). However, Martin asserts that his decision to resign was not made in response to the allegations, in the sense that he was admitting that they were true. (Docs. 128 ¶ 21, 144 ¶ 19). Instead, Martin asserts in his deposition testimony that he resigned:

Because the company had gotten dysfunctional. Dr. Moore and Finley had gone rogue. Dr. Moore was conducting a study on his own and wouldn't disclose the protocols of that study to either Dr. Peters or myself. I asked Finley, what were the protocols and he wouldn't tell me. The company was

60

heading off a cliff and I said the only way to save this company was for Lipes
and Rainey to join the board and for me to resign.

(Doc. 109-1 at 69:20-70:4). Additionally, he asserts that he was already planning to

resign from Med-Dev prior to Finley raising the unauthorized expense issue and

closing the Wells Fargo bank account, pointing to an email he sent to Finley and

Albanese in December 2013 that indicates that he was planning to resign in the first

half of 2014. (Docs. 128 ¶ 33, 128-8, 144 ¶ 26). The Manifesto also references this

plan: "Prior to April 19, 2014, MARTIN stated his intention to resign in emails dated

December 27 & 30, 2013." (Doc. 109-2 at 130). Viewed through the eyes of Martin

and in context, the statement in the Newsletter is arguably defamatory, because it

could imply that he was admitting his guilt:

*Internal Happenings*

On April 19, 2014, after an extensive internal Investigation into the alleged
mishandling/misappropriation of Med-Dev corporate funds, Michael G. Martin
was forced to resign as Chairman of the Board & Corporate Officer of Med-
Dev. Mr. Martin is no longer associated with Med-Dev and accordingly
should not be communicated with to discuss any Med-Dev Corp. business
activities.

Also, William P. Peters, MD, PhD resigned as an Independent Board member
and as CEO. Dr. Peters continues to remain a founding member of Med-Dev.

(Doc. 112-4 at 61). The Court also notes that at the time the Newsletter was published in

August 2014, Martin asserts he had already withdrawn his offer to resign from the Board.

(Docs. 109-1 at 114, 128 ¶ 24, 128-6). Given the extensive factual disputes on this issue,

61

the Court cannot rule as a matter of law that the Newsletter was "substantially true" with respect to the statements regarding Martin's resignation.

Finley and Albanese also cannot avail themselves of conditional privilege, an affirmative defense to defamation under Pennsylvania law. 42 Pa. Cons. Stat. Ann. § 8343(b)(2). "Communications are privileged when they are 'made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause . . . .'" *Emekekwue v. Offor*, 26 F. Supp. 3d 348, 364 (M.D. Pa. 2014) (quoting *Choi v. Sohn*, Civ. No. 01-1782, 2004 WL 627060, at *3 (E.D. Pa. Mar. 1, 2004)). "Stated differently, a conditional privilege arises 'whenever circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.'" *Emekekwue*, 26 F. Supp. 3d at 364 (quoting *Tucker v. Merck & Co., Inc.*, 102 F. App'x 247, 253-54 (3d Cir. 2004)). Pennsylvania courts have recognized that "in the past, corporations and directors of corporations have been allowed to claim a conditional privilege when publishing allegedly defamatory statements." *Simms v. Exeter Architectural Prod., Inc.*, 916 F. Supp. 432, 436 (M.D. Pa. 1996) (citing *Montgomery v. Dennison*, 69 A.2d 520 (Pa. 1949); *Bargerstock v. Washington Greene Cmty. Action Corp.*, 580 A.2d 361 (Pa. Super. Ct. 1990)).

"Once the conditional privilege has been raised and established, the burden of

proving abuse of that conditional privilege then shifts to the plaintiff." *Simms*, 916 F. Supp.

at 436 (citing *Banas v. Matthews Intern Corp.*, 502 A.2d 637, 638 (Pa. Super. Ct. 1985)).

> Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to [a] person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

*Simms*, 916 F. Supp. at 436 (quoting *Beckman v. Dunn*, 419 A.2d 583, 588 (Pa. Super. Ct.

1980) (internal citations and footnote omitted)). The existence of a conditional privilege is a

question of law, but it is a question of fact as to the possible abuse of the privilege. *Simms*,

916 F. Supp. at 436 (citing *Johnson v. Res. for Human Dev., Inc.*, 860 F. Supp. 218, 223

(E.D. Pa. 1994); *Agriss*, 483 A.2d at 463).

As a threshold matter, the Court notes that Finley and Albanese, as corporate

directors of Med-Dev, may have had a conditional privilege to make the allegedly

defamatory statements to their shareholders if they were acting as corporate directors when

doing so, because the allegations of wrongdoing against Martin, a former director, "could

affect the shareholders and the corporation." *Simms*, 916 F. Supp. at 436 (finding a

conditional privilege under similar circumstances). However, Finley and Albanese have not

established, as a matter of law, that they did not abuse their conditional privilege, to the

extent it existed. Martin has raised numerous disputes of material fact to argue that the

purportedly defamatory statements in the Newsletter and Manifesto were "actuated by

malice or negligence." *Id.* For example, Martin points to an email he sent to Albanese in 2010 informing him that the Bergen County charges, later mentioned in the Manifesto as having never been disclosed by Martin, were being dropped. (Doc. 128-34). Martin also points to a sworn statement from Frank LaForgia, a shareholder of Med-Dev, who testified that Albanese made slanderous and inflammatory statements about Martin, and was trying to promote "disharmony between Martin and me to the benefit of him and his associates." (Doc. 128-13 ¶¶ 10, 12). As previously noted, Martin also points to an email chain between Defendants where they discussed a possible retraction of "a prior statement that Martin was 'forced to resign.'" (Doc. 128-33 at 4). And Tomasek testified in his sworn statement that Finley and Albanese knew that "the information in the August 2016 Newsletter is false" and that "[i]t appeared to [him] that there was a personal vendetta against Martin." (Doc. 144-16 ¶¶ 13, 16).

As a result, the Court will deny Finley and Albanese summary judgment on these grounds.

### 3. FALSE LIGHT

Finley and Albanese further argue that Martin's false light claim fails "for same reasons [sic] his defamation claim fails." (Docs. 122 at 34, 125 at 33). Finley and Albanese do not specify what these "reasons" are, but the Court notes that one of the major distinctions between defamation and false light is that proving false light requires a showing that the communication was publicized with knowledge or in reckless disregard of its falsity.

64

*Graboff*, 744 F.3d at 136. As noted above, Martin has raised genuine factual disputes regarding Finley and Albanese's purported knowledge or reckless disregard of the purported falsity of the Newsletter and Manifesto. Such factual disputes preclude the entry of summary judgment. *Lorentz v. Westinghouse Elec. Corp.*, 472 F. Supp. 946, 953 (W.D. Pa. 1979).

Because the Court has rejected all of Finley and Albanese's arguments against Martin's defamation and false light claims, the claims survive.

## D. IIED (COUNT V – ALL DEFENDANTS)

On Martin's final claim for IIED, all Defendants argue that the claim fails because their alleged misconduct does not satisfy the strict requirements of Pennsylvania law that the behavior be "outrageous." (Docs. 122 at 35-37, 123 at 16-18, 125 at 34-36). They also contend that because Martin did not submit an expert report to support his claim of harm, he cannot provide expert testimony at trial and so cannot prove his claim. (Docs. 122 at 37-39, 123 at 18-20, 125 at 36-38). Martin responds that the question of whether the misconduct is outrageous is a question of fact for the jury, and that his treating physician was not required to produce an expert report and will testify at trial as a lay witness. (Docs. 129 at 19-23, 143 at 10-15, 145 at 20-24).

Ordinarily, in order to prevail on an IIED claim, a defendant's "conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy*

v. Angelone, 554 Pa. 134, 720 A.2d 745, 754 (Pa.1998) (quoting *Buczek v. First Nat'l Bank*

*of Mifflintown,* 366 Pa. Super. 551, 531 A.2d 1122, 1125 (Pa. Super. Ct.1987)). The

Pennsylvania Superior Court has repeatedly held that, "generally [a cognizable IIED] case is

one in which the recitation of the facts to an average member of the community would

arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" *See, e.g.,*

*Small v. Juniata Coll .,* 452 Pa. Super. 410, 682 A.2d 350, 355 (Pa. Super. Ct. 1996). As

Magistrate Judge Carlson noted in his Report and Recommendation, (Doc. 63 at 32-33):

> Thus, with respect to claims for intentional infliction of emotional distress,
> "courts have been chary to allow recovery for a claim of intentional infliction of
> emotional distress. Only if conduct which is extreme or clearly outrageous is
> established will a claim be proven." *Hoy v. Angelone,* 720 A.2d 745, 753-54
> (Pa. 1998). Indeed, the Restatement (Second) of Torts instructs that "[i]t has
> not been enough that the defendant has acted with intent which is tortious or
> even criminal, or that he has intended to inflict emotional distress, or even
> that this conduct has been characterized by 'malice,' or a degree of
> aggravation that would entitle the plaintiff to punitive damages for another
> tort." Restatement (Second) of Torts § 46, cmt. d; *Hoy,* 720 A.2d at 754.

The Court finds it unnecessary to address Defendants' second argument against

Martin's IIED claim regarding the availability of expert medical testimony at trial because it

agrees with Defendant's first argument that the misconduct alleged here by Martin is not

sufficiently "outrageous" to support an IIED claim. While the Court was reluctant to dismiss

Martin's IIED claim earlier in this litigation, the further development of the factual record at

the summary judgment stage has convinced the Court that the alleged misconduct of

Defendants does not satisfy Pennsylvania's strict requirements for an IIED claim. Martin's

case against Defendants arose out of a business dispute in which the parties accused each

other of misconduct, and does not present the circumstances under which Pennsylvania courts have previously found outrageous conduct to support an IIED claim. As a result, the Court will grant Defendants' request for entry of summary judgment on Martin's IIED claim.

### E. AVAILABILITY OF PUNITIVE DAMAGES (ALL DEFENDANTS)

Finally, all Defendants contend that the granting of punitive damages on all of Martin's claims should be denied. Martin responds in his Oppositions that the factual record "is replete with examples of [Defendants'] outrageous conduct and [their] reckless indifference to Martin's rights." (Docs. 143 at 15, 145 at 24). At the least, Martin contends, "there is a question of material fact as to these matters." (Docs. 143 at 15, 145 at 24). The Court agrees.

Punitive damages "are not awarded to compensate the plaintiff for her damages, but rather to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Phillips v. Cricket Lighters*, 584 Pa. 179, 190, 883 A.2d 439 (2005). In Pennsylvania, "[p]unitive damages may appropriately be awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 189, 883 A.2d 439 (internal citation and quotation marks omitted). Reckless indifference, "or as it is sometimes referred to, 'wanton misconduct', means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it

67

highly probable that harm would follow." *Smith v. Brown*, 283 Pa. Super. 116, 120, 423 A.2d 743 (Pa. Super. 1980) (internal citation and quotation marks omitted). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld v. Merriam*, 506 Pa. 383, 396, 485 A.2d 742 (1984). "The Supreme Court has made clear that, historically, the issue of punitive damages was tried to a jury in cases sounding in tort." *Pichler v. UNITE*, 542 F.3d 380, 389 (3d Cir. 2008) (citing *Day v. Woodworth*, 54 U.S. (13 How.) 363, 14 L. Ed. 181 (1851)). Thus, "where there is a genuine issue of material fact regarding the willfulness or recklessness of a defendant's conduct," summary judgment is inappropriate. *Pichler*, 542 F.3d at 389; *see also Eagle Traffic Control v. Addco*, 889 F. Supp. 200, 201 (E.D. Pa. 1995) (citing *Trotman v. Mecchella*, 618 A.2d 982, 985 (Pa. 1992)) (noting in Pennsylvania "[t]he question of punitive damages is usually determined by the trier of fact; the Court can decide the issue only when no reasonable inference from the facts alleged supports an award of punitive damages").

As noted above, this case is essentially about a business dispute that allegedly got bitterly out of hand, with a messy and contested factual record. While Defendants are correct in noting that Martin admitted to engaging in the improper use of Med-Dev funds, and may be able to prove at trial that they did not engage in conduct with an evil motive or reckless indifference to Martin's rights, that is a determination for a jury to make. Thus, the Court will deny Defendants summary judgment on the issue of punitive damages, and it will remain a possible avenue of recovery for Martin at trial.

## V. CONCLUSION

For the reasons outlined above, the Court will grant Defendants' Motions in part and

deny them in part. A separate order follows.

Robert D. Mariani
United States District Judge